File Name: 07a0532n.06

Filed: July 27, 2007

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 06-2351**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KATINA SHERRILLS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LISA BEISON; FLOYD WILSON, JR.; PAT | ) | WESTERN DISTRICT OF MICHIGAN |
| KIMMEL; SPECTRUM HEALTH WORTH | ) | |
| HOME CARE; and SPECTRUM HEALTH | ) | |
| KENT COMMUNITY CAMPUS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: CLAY and SUTTON, Circuit Judges; and GREER, District Judge.[*]

SUTTON, Circuit Judge. Katina Sherrills appeals the district court's decision granting summary judgment to her former employer on claims of retaliation and race discrimination. Agreeing with the district court that her case does not present any genuine issues of material fact and that the defendants are entitled to judgment as a matter of law, we affirm.

---

[*] The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

I.

In 1994, Katina Sherrills, who is African-American, pleaded guilty to a felony charge of welfare fraud and was sentenced to 60 months' probation. Following the conviction, she became certified to work as a Competency Evaluated Nurse Aide. On May 10, 2002, Sherrills began a job with Worth Home Care, a division of Spectrum Health Worth Services. Worth Services is a non-profit organization that provides in-home nurses and health aides to individuals in Western Michigan. The company is a member of the Spectrum Health Continuing Care Group, a group also consisting of residential nursing homes, including the Kent Community Campus and the Continuing Care Center. In addition to providing in-home care, Worth's nurse aides also are contracted out to work at these Spectrum-owned facilities.

On the same day that she started her job with Worth—May 10—a new Michigan law governing employment at nursing home facilities went into effect. The law prohibited such facilities from "employ[ing] . . . [and] independently contract[ing] with . . . an individual who regularly provides direct services to patients or residents in the health facility" if that individual had committed a felony in the past 15 years. 2002 Mich. Pub. Acts 303, § 20173(1)(a). The law also contained a grandfather clause, exempting from its scope people "employed by . . . [or] under independent contract to . . . a health facility or agency before the [law's] effective date." *Id*. § 333.20173(2). The new law did not directly cover Worth or most of Sherrills' work there because she principally performed in-home nurse care, though Worth occasionally assigned her to shifts at the Continuing Care Center, a nursing home covered by the new law.

Things were going well for Sherrills until December 13, 2003. On that day, she was scheduled to work back-to-back, eight-hour shifts at a client's home, with the second shift ending at midnight. Midnight came and went without her replacement arriving to relieve her. *See* JA 200 (explaining Worth's policy preventing workers from leaving until a replacement arrives). After Sherrills had worked for more than 24 consecutive hours, Worth finally secured a replacement, allowing Sherrills to leave.

Pat Kimmel, the branch manager at Worth, called Sherrills to discuss the incident. Kimmel had already spoken with the tardy worker, who happened to be white. Kimmel "scream[ed]" at Sherrills and "assumed that what the [white] aide [said] was correct" instead of trying to get her side of the story. JA 242. At a meeting the next day, Sherrills accused Kimmel of race discrimination for "believ[ing] what the Caucasian aide had said instead of asking [her] what happened." *Id.*

As the branch manager, Kimmel supervised the scheduling process and occasionally was directly involved in scheduling decisions. In January 2004, Sherrills for the first time during her employment with Worth sought to work at the Kent Community Campus. Kimmel refused this request because the Kent Community Campus was a nursing home facility covered by the Michigan law, because Kimmel believed that Sherrills' criminal record prohibited her from working there and because Kent Community Campus took the position that the new law prevented Sherrills from working there.

When Lisa Beison, who worked in human resources, learned that Sherrills was working occasionally at the Continuing Care Center—also a covered nursing facility—she contacted Floyd Wilson, an African-American and the Chief Human Resources Officer for the entire Continuing Care Group. After consulting with an attorney, Wilson concluded that Sherrills should not be allowed to work at either the Kent Community Campus or the Continuing Care Center. Wilson and Beison met with Sherrills on June 10, and on June 16 Wilson sent her a letter informing her that "due to [her] past felony conviction, [she was] not eligible to be contracted out to skilled nursing facilities or homes for the aged through Worth," although she could continue to "work in the home care division." JA 183.

The three had another meeting on June 22, this time with lawyers present. The company stood by its position but agreed to pay Sherrills $12 per hour for the next three months to compensate her for the lower pay she would earn (because in-home work paid less than nursing home work did) while she tried to get her conviction reduced to a misdemeanor and tried to obtain a declaratory ruling that she was covered by the law's grandfather clause. Sherrills eventually succeeded in both efforts. *See* JA 43 (Michigan Department of Health declaratory ruling holding that the law at issue "do[es] not apply to an individual who is employed by . . . a health facility or agency before the effective date of the . . . act, but who subsequently seeks to transfer his or her employment either to another employer or to another facility or agency through the same employer"); JA 259 (Sherrills explaining that Michigan reduced her felony to a misdemeanor). And in September 2004, Worth again contracted Sherrills out to the Continuing Care Center.

Sherrills filed suit in federal district court charging Worth, the Kent Community Campus, Beison, Kimmel and Wilson with race discrimination and retaliation in violation of federal and state law. *See* 42 U.S.C. § 2000e *et seq*.; *id.* § 1981; Elliot-Larson Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq*. The district court granted summary judgment to the defendants on the federal-law claims and declined to exercise jurisdiction over the state-law claims.

II.

On appeal, Sherrills argues (1) that Worth refused her requests for work at the Kent Community Campus and at the Continuing Care Center in retaliation for her complaints of race discrimination and (2) that Worth scheduled its caregivers in a racially discriminatory manner. Because Sherrills relies on circumstantial evidence for each of these claims, we apply the familiar *McDonnell Douglas* burden-shifting framework. *See Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (applying *McDonnell Douglas* to a retaliation claim); *see also Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992) (explaining that claims under Title VII and § 1981 are correctly "lumped together" under *McDonnell Douglas*) (internal quotation marks omitted). Under that framework, Sherrills bears the initial burden of establishing a prima facie case of discrimination. If she succeeds in doing so, the burden shifts to Worth to produce a legitimate, non-discriminatory explanation for its decision. Sherrills finally must establish that any non-discriminatory reason offered by Worth is pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

A.

Like the district court, we see no need to address Sherrills' efforts to meet the prima facie requirements of her retaliation claim because as a matter of law she has not discredited Worth's reason for its action—the company's interpretation of Michigan law. In order to survive summary judgment, Sherrills must make a cognizable claim (after receiving the benefit of all reasonable inferences from the evidence) that Worth's explanation was pretextual because it (1) had no basis in fact, (2) did not actually motivate its decision or (3) was insufficient to motivate its decision. *See Manzer v. Diamond Shamrock Chems Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); Fed. R. Civ. P. 56(c). She cannot satisfy this requirement.

*First*, Worth's reliance on Michigan law was based in fact. At the time Worth made its decision, § 333.20173(1)(a) prohibited nursing home facilities such as the Kent Community Campus and the Continuing Care Center from employing or contracting with convicted felons, and it is undisputed that Sherrills had a felony welfare-fraud conviction on her record. Sherrills, in short, was plainly covered by the prohibition.

The question was whether the grandfather clause saved her. That clause exempted individuals "employed by [or] under contract to . . . a health facility or agency before the effective date of the . . . act." Mich. Comp. Laws § 333.20173(2) (2005). There are two plausible interpretations of this provision: one, that an employee could continue working at the same facility that employed her when the act became effective; two, that the law exempted employees who had

worked at *any* covered facility in the past. Under the former interpretation, Sherrills—who began her stint at Worth the same day the law went into effect—could not work at a covered facility; under the latter interpretation she could, for she had worked at nursing homes in the past, including both the Kent Community Campus and the Continuing Care Center.

While the Michigan Department of Community Health eventually issued a declaratory opinion adopting the more forgiving interpretation, Worth "reasonably relied on the particularized facts then before it," *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998), in deciding to protect itself by taking a more "conservative position," JA 163. A straightforward reading of the grandfather clause shows that it was vague—so vague that the Michigan legislature eventually amended the law to remove the ambiguity. *See* Mich. Comp. Laws § 333.20173a(2)(a) (amended law specifying that "[a]n individual who is exempt under this subdivision is not limited to working within the health facility or agency with which he or she is employed by . . . on the effective date of this section"). Other employers took a similarly conservative approach before the passage of this clarifying amendment. *See* JA 166, 169. And Worth did not make a rash decision but consulted legal counsel to assist it in the decision-making process. *See* JA 181; *Smith*, 155 F.3d at 807 ("[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

*Second*, Sherrills has not shown that "the sheer weight of the circumstantial evidence of discrimination" creates a triable issue of fact over whether Worth's "explanation is a pretext" that did not actually motivate its decision. *Manzer*, 29 F.3d at 1084. While Worth's initial decision to

deny her hours at the Kent Community Campus came on the heels of her complaint about Kimmel, it was Sherrills who chose that time—the first time after returning to Worth—to make a formal effort to work at Kent Community Campus, a decision that set in motion Worth's *and* Kent's inquiry into whether the new law permitted someone with a felony record to work at a covered nursing facility. Even if for the sake of argument temporal proximity alone were sufficient to establish the causation element of a *prima facie case* of retaliation, *see Nguyen v. City of Cleveland*, 229 F.3d 559, 565, 567 (6th Cir. 2000) (rejecting argument that "temporal proximity between the protected activity and the alleged discriminatory act [was] alone sufficient to establish" the causal connection in that case but recognizing that "there may be circumstances where evidence of temporal proximity alone would be sufficient"), "in order to make [a showing of pretext], the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of" unlawful conduct, *Manzer*, 29 F.3d at 1084.

The rest of the circumstantial evidence, moreover, hardly "overwhelms" Worth's explanation. *Id.* When Worth hired Sherrills in May 2002, Kimmel was aware of her criminal record but assumed that she nonetheless could work in nursing home facilities. With this understanding, Kimmel permitted Sherrills to work occasionally at the Continuing Care Center during the first year and a half of her employment. There is no evidence, however, that anyone at the Continuing Care Center knew of Sherrills' record during this time, *see* JA 90 (noting that Worth and the Continuing Care Center "are separate corporate entities"); JA 180 (Beison stating that Continuing Care Center explained to her that it did not realize that Sherrills had a disqualifying

felony), and the facility decided that Sherrills could not work there upon learning of her felony, *see* JA 180. The Kent Community Campus, for its part, did not permit Sherrills to perform work at its facility after the passage of the law in 2002.

In addition, nothing about the company's subsequent handling of the situation reveals pretext. Beison learned about Kent Community Campus's position on the matter from Kimmel. After discovering that Sherrills was continuing to work at the Continuing Care Center, Beison contacted that facility's human resources department and Wilson, realizing that she "needed to get some clarification" on the operation of the law. JA 181. Wilson enlisted the assistance of an attorney, and the company agreed to pay Sherrills an inflated rate to make up for the lower wages she would be paid for in-home work. And once Sherrills had her conviction downgraded to a misdemeanor, Worth again offered her hours at the Continuing Care Center.

*Third*, Worth's interpretation of the Michigan law gave the company ample reason to act. Had that interpretation been correct, any facility employing Sherrills would have been breaking the law. And the evidence shows that Worth did not send any other employees with felony convictions to the Kent Community Campus or to the Continuing Care Center during this time. *See Manzer*, 29 F.3d at 1084 (noting "insufficient to motivate" showing "ordinarily . . . consists of evidence that other employees" were treated differently) (emphasis omitted).

B.

Sherrills also claims that Worth discriminated on the basis of race in scheduling its caregivers. According to her, "white aides with less experience and seniority were getting the more desired and better permanent shifts when scheduled in the patients' homes." Br. at 34. She has failed, however, to show that "similarly situated non-protected employees were treated more favorably" than she was. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (internal quotation marks omitted). Anna Stroh, her most promising candidate, received more favorable treatment—by receiving a permanent in-home position that Sherrills was also interested in receiving despite having less experience—but was not "similarly situated in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted). Most pertinently, Sherrills has not shown that she was available to work the particular shifts given to Stroh, *see, e.g.*, JA 193 (Kimmel explaining that schedulers would first look to see who was available when looking to fill a position), and Stroh, unlike Sherrills, was not a licensed Competency Evaluated Nurse Aide—meaning that the care she could provide was "more limited" but that she was also paid less, thus providing a lower-cost option for the client, *see* JA 63.

Even if Sherrills could succeed in making a prima facie case, she cannot counter Worth's evidence that its scheduling decisions were based on legitimate factors such as availability, skills, cost and patient needs. Her circumstantial evidence is weak, consisting mainly of a politically incorrect (although admittedly "not blatantly racist," Br. at 44) email forwarded around the office by Kimmel before Sherrills began her job at Worth, *see* JA 334 (email containing George Carlin

routine); JA 332 (Kimmel was disciplined for "unprofessional behavior"); a racial slur overheard by one of Sherrills' co-workers sometime during 2002, *see* JA 425; *see also Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) ("[I]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (internal quotation marks omitted); and Sherrills' subjective impressions, *see, e.g.*, JA 243 (Sherrills explaining that Kimmel "didn't seem to appear comfortable talking with me"); *see also Woythal v. Tex-Tenn Corp*, 112 F.3d 243, 247 (6th Cir. 1997) ("[M]ere personal belief, conjecture and speculation are insufficient to support an inference of . . . discrimination.") (internal quotation marks omitted).

## III.

For these reasons, we affirm.