*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROYAL D. CLINE,

                 *Plaintiff-Appellant,*

    *v.*

                            No. 07-5639

BWXT Y-12, LLC,

                 *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 04-00588—Robert Leon Jordan, District Judge.

Argued: March 12, 2008

Decided and Filed: April 1, 2008

Before: DAUGHTREY and SUTTON, Circuit Judges; and POLSTER, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** John D. Agee, RIDENOUR & RIDENOUR, Clinton, Tennessee, for Appellant. Edward G. Phillips, KRAMER RAYSON, Knoxville, Tennessee, for Appellee. **ON BRIEF:** John D. Agee, RIDENOUR & RIDENOUR, Clinton, Tennessee, for Appellant. Edward G. Phillips, Francis L. Lloyd, KRAMER RAYSON, Knoxville, Tennessee, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Royal Cline challenges a decision rejecting his state-law, age-discrimination claims as a matter of law. One of Cline's claims is barred by the statute of limitations, and another claim fails because the company offered a nondiscriminatory, non-pretextual reason for its decision. But a third claim, based on retaliation, deserves further consideration because a reasonable jury could infer that the company had knowledge of this lawsuit and took an adverse employment action because of it.

_____

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

## I.

Born in 1943, Cline worked for 31 years as a government contractor at United States Department of Energy facilities in the "nondestructive testing" of military weapons. From 1969 to 1994, Cline worked at the Department's Y-12 National Security Complex as a technician, supervisor and trainer. From 1994 to 2000, he worked as a supervisor at the Department's Oak Ridge National Laboratory. In 2000, Cline was laid off in a reduction in force.

Between 2000 and 2004, Cline applied unsuccessfully for numerous positions with the company that manages Y-12, an entity named BWXT, which we will call "the company."

In 2004, Cline filed this age-discrimination lawsuit against the company in Tennessee court, and the company removed the action to federal court on diversity grounds. (Cline is a citizen of Tennessee, and the two members of the company are a Delaware corporation with its principal place of business in Virginia and a Nevada corporation with its principal place of business in Maryland.) In 2006, the company moved for summary judgment, which the district court granted.

## II.

We assess age-discrimination claims under the Tennessee Human Rights Act applying the same standards that govern federal discrimination claims. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006). And we give fresh review to the district court's summary-judgment decision, drawing all reasonable inferences in Cline's favor. *Id.* at 619–20.

### A.

Cline first says that the company discriminated against him by failing to hire him for a technical-specialist position. Under the familiar *McDonnell Douglas* standard, Cline bears the burden of establishing a prima facie case of discrimination. If he succeeds in doing so, the burden shifts to the company to produce a legitimate, non-discriminatory explanation for its decision, after which Cline must establish that any non-discriminatory reason offered by the company is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

In June 2004, the company posted an opening for technical specialists in the product certification department. The posting indicated that the position "requires a 'Q' clearance"—the Department of Energy's highest level of security clearance, which takes up to two years to obtain. It also advised that certification in the Human Reliability Program might be required, which takes 12 additional months after an employee is "Q-cleared."

The company interviewed internal applicants in August 2004 and external applicants in October 2004, expecting to hire five individuals. Cline submitted an application but was not selected for an interview. In late October, the company put the posting "on hold for budgetary reasons." When sufficient funding allowed the company to hire three individuals the following year, John Stanley, the hiring manager for the position, selected three internal candidates, all of whom were younger than Cline.

Like the district court, we see no reason to determine whether Cline established a prima facie case of discrimination because he has not discredited the company's reasons for its action. The company explained that it did not hire Cline because it did not think he had several recommended credentials—an active Q-clearance, Human Reliability Program certification and radiography certification—and because, after the company lifted the budget hold, it posted the opening only on an internal basis. Cline has not shown that these explanations amounted to pretextual covers for discrimination—whether because (1) they had no basis in fact, (2) they did not actually motivate the

company's decision or (3) they did not suffice to motivate that decision. *See generally Bender*, 455 F.3d at 624.

*The company based its decision on uncontradicted facts.* Cline's Q-clearance expired in 2000, and his resume did not note any certification in radiography or in the Human Reliability Program. And no one disputes the fact that, after the company lifted the budget hold, it posted the position just for internal candidates.

*The evidence confirms that these facts motivated the company's decision.* The three hired individuals had Q-clearance and Human Reliability Program certification, while Cline did not—meaning that it would have taken him two and a half to three years to become eligible to work in the department. "If he had indicated on his resume that he had active Q-clearance," Stanley said, "I would have interviewed him." Despite the absence of any mention of a Q-clearance on his resume, Cline maintains that he "remained Q-cleared through 2006," which the district court determined was false as a matter of law. But even assuming Cline had a Q-clearance, as he urges on appeal, he has only himself to blame for failing to note that fact on his resume. Employers have no duty to determine whether an applicant has more qualifications than his resume indicates.

The three hired individuals also were internal candidates. In the aftermath of the budget hold, the company chose to give a preference to internal applicants over external ones, and nothing shows it did not follow that policy here.

Cline responds that the company *interviewed* "younger, less qualified external applicants" for the position, showing that its proffered reasons were pretextual. He points out, for example, that he had a Level III radiography certification and that several interviewees did not. But, again, Cline did not put this qualification on his resume, and, again, Cline cannot premise a discrimination claim on information he never gave the company.

Other interviewees, Cline adds, lacked one or all of the qualifications that the company says were fatal to his application. "Several," he says, "lacked any . . . radiological experience at all," including Mark Manning (a screener at an airport and a security escort whose application was late), Tyrone Ballinger (a security officer), Scott Rogers (a student working on his degree), Gregory Scott Bell (a student working on an engineering degree) and Jason Jones (an individual with experience in tire and lube express). But each of these applicants had other qualifications that Cline did not have. Manning and Ballinger were Q-cleared; Rogers and Bell were potential candidates for the company's college degree program; and Jones received an interview because "he came across as a mechanical-type person with a lot of mechanical experience" who might have been a fitting replacement for "one mechanical [x-ray person] that [was] going to be retiring before too long."

While Cline may disagree with the wisdom of the company's decision to value some of these characteristics over others, he "may not simply substitute [his] own business judgment for that of the defendant." *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 550 (6th Cir. 2004). The company emphasized the importance of Q-clearance, and it was reasonable for the company to seek some candidates for its college program and to talk with a candidate who could replace a retiring employee. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) ("[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."). That the job description itself did not express an interest in college program candidates does not prevent the company from including such candidates in its mix of interviewees. *See Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006) ("[E]mployers are *not* rigidly bound by the language in a job description."). And the company's decision to accept Manning's late application no more suggests that the company discriminated against Cline's timely

application than it suggests the company was more concerned with the content of an applicant's resume than with the date it was submitted. *See Rowan*, 360 F.3d at 550.

*The company's reasons sufficed to motivate its decision.* Cline's status as an external candidate, combined with his failure to list key credentials on his resume, "gave the company ample reason" not to hire him. *Sherrills v. Beison*, 242 F. App'x 332, 337 (6th Cir. July 27, 2007). And, as we have shown, he has failed to demonstrate that younger individuals in a "substantially identical" situation received more favorable treatment. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

Cline argues that a federal statutory preference for Cold War workers covered his application, proving that indeed the company's reasons could not have legitimately motivated its decision. "Employees whose employment in positions at [Department nuclear] facilities is terminated," the preference says, "shall, to the extent practicable, receive preference in any hiring of the Department of Energy (consistent with applicable employment seniority plans or practices of the Department of Energy . . . )." 50 U.S.C. § 2704(c)(2). But Oak Ridge treats the preference as a tie-breaker between similarly qualified external candidates, and the preference does not apply "when a contractor fills vacant positions through internal means." Cline has not satisfied either condition.

B.

Cline next argues that the statute of limitations does not bar his claim stemming from an unsuccessful application to be a chemical operator. In October 2001, the company posted the opening, and Cline applied for it, as one of roughly 500 applicants for 41 positions. The company made all of the external offers for the positions by August 13, 2002. Consistent with its general practice, the company did not notify Cline (or any of the other unsuccessful applicants) that he had been rejected for the position, and Cline never checked the status of his application.

Reasoning that "[t]hrough the exercise of reasonable diligence, Cline should have known that he was not being hired" for this position "more than one year before he filed suit" in November 2004, the district court held that the claim was time barred. *See* Tenn. Code Ann. § 4-21-311(d) (stating that the claimant must bring an action "within one (1) year after the alleged discriminatory practice ceases"). We agree.

Under Tennessee law, if a discriminatory practice is a "discrete act" rather than a "continuing violation," the practice "'ceases' as of the time it occurs, not as of the time the consequences of the act cease." *Booker v. Boeing Co.*, 188 S.W.3d 639, 645 (Tenn. 2006). An employer's failure to hire a job applicant represents a discrete act. Much like the denial of a promotion, *see Austion v. City of Clarksville*, 244 F. App'x 639, 648–49 (6th Cir. July 31, 2007) (applying Tennessee law), or "the decision to terminate an employee," *Booker*, 188 S.W.3d at 645, a failure to hire represents a "separate and distinct" act for these purposes, *id.* at 648. *See Gilbert v. Choo-Choo Partners, L.P.*, No. E2006-01507-COA-R3-CV, 2007 WL 1049270, *6 (Tenn. Ct. App. Apr. 9, 2007) ("[W]here the alleged discriminatory practice is a discrete act such as termination, failure to promote, denial of transfer, or *refusal to hire*, each alleged act of discrimination must be evaluated independently to determine whether it occurred within the limitations period.") (emphasis added and internal quotation marks omitted); *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (stating that "discrete acts [include] termination, failure to promote, denial of transfer, [and] refusal to hire") (internal quotation marks omitted).

Because the company's failure-to-hire decision was a discrete act, Cline cannot get any purchase from the continuing-violation doctrine. *See Booker*, 188 S.W.3d at 645. The allegedly discriminatory act "t[ook] place" or " happen[ed]," *id.* at 648, in August 2002, when the company

filled the last of these positions—over two years before Cline filed this action. That some of the hired employees reported to work later makes no difference, for reporting to work is merely a "consequence[]" of the allegedly discriminatory decision—namely, hiring other applicants over Cline. *Id.* at 645; *cf. Weber v. Moses*, 938 S.W.2d 387, 391–92 (Tenn. 1996) (concluding that, in a discriminatory-discharge claim, the date on which an employee actually stops working is irrelevant for purposes of the statute of limitations).

Even if we give Cline the benefit of the discovery rule that applies to Title VII and ADEA claims, that does not help him either. The limitations period still runs "as soon as a potential plaintiff either is aware, or should be aware after a sufficient degree of diligence, of the existence and source of an actual injury." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 590 (3d Cir. 2005) (emphasis omitted); *see also Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 95 (Tenn. Ct. App. 1995). And Cline's claim of "reasonable diligence" falls flat, as he made no effort for *three years* "to monitor the status of [his] application." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391 (3d Cir. 1994); *Nilsen v. City of Moss Point*, 621 F.2d 117, 121 (5th Cir. 1980).

Cline argues that actual notice of the failed application should be the trigger date, pointing to *Weber v. Moses*, 938 S.W.2d 387 (Tenn. 1996), which said that the limitations period begins to run "when the plaintiff is given unequivocal notice of the employer's termination decision, even if the employment does not cease until a designated date in the future." *Id.* at 391–92. But *Weber* merely endorses *one way* in which the discovery rule may apply: when the plaintiff discovers the employer's act through actual notice. It does not purport to foreclose application of the reasonable-diligence doctrine. Even then, *Weber* was a discriminatory-discharge case, and the employment customs with respect to actual notice of a firing, as opposed to actual notice of a failure to be hired, are by no means one and the same—particularly in the context of a pool of over 500 job applicants. It is one thing to tell a worker not to show up for work on a certain day; it is quite another to take on responsibility for telling 500 unsuccessful applicants they didn't get the job.

Cline adds that he "understood from talking with personnel of the Career Center and others that there would be a lot of hiring for these positions for a long time." But to toll the limitations period based on equitable estoppel, he must show a "false representation or concealment." *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004). There was nothing false about this statement: After all, there *was* "a lot of hiring" (no less than 41 positions), and it *did* take "a long time" to complete the hiring process (nearly one year after the company posted the position externally).

C.

Cline, lastly, argues that the district court erred in rejecting his retaliation claim as a matter of law. To establish a prima facie case of retaliation under Tennessee law, a plaintiff must show that (1) he engaged in a protected activity, (2) his employer had knowledge of the plaintiff's exercise of protected rights, (3) the employer thereafter took an employment action adverse to the plaintiff and (4) there was a causal connection between the protected activity and the adverse employment action. *Newsom*, 924 S.W.2d at 96.

In 2005, Ralph Mack sought to hire an individual to conduct an 80-hour certification program in ultrasonics. Because no one inside the company was qualified to conduct the training, Mack looked outside the company and learned that Cline could do the job. In September, Mack asked Cline to take the job, and Cline agreed to do it. Mack and Cline identified possible dates, locations and equipment for the training, and Cline began looking for training materials.

Later that same year, however, Mack told his supervisor (Zava) "that Mr. Cline was the person that we were considering to do the training." "And at that point," Mack says, "she mentioned

that we were in litigation with Mr. Cline and that he may not be the best person to do the training because of the litigation factor." As a result, Mack told Cline that he had "decided to table the . . . training."

The company correctly concedes that these undisputed facts show that Cline has satisfied two elements of the claim: The filing of a lawsuit against the company for age discrimination constitutes a protected activity, *see* Tenn. Code Ann. § 4-21-301(1), and the company's change of heart represents an adverse employment action. What, however, of the second and fourth elements of the claim? Under the second element, Cline's protected activity had to be "known to those who made [the adverse employment] decision." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999). Although the above evidence shows that Mack and Zava knew that Cline was "in litigation with" the company, there is no evidence that they knew the litigation involved age discrimination. Because Mack and Zava did not have "any knowledge *of the substance of Cline's present suit*," the district court held that there was no genuine issue of material fact as to their knowledge of a protected activity.

We faced a similar problem in *Bacon v. Honda of America Manufacturing, Inc.*, 192 F. App'x 337, 343 (6th Cir. July 13, 2006), but reached a different conclusion. There, a Honda vice president suggested that a manager should transfer an employee to a different group, mentioning "legal concerns" regarding the employee. *Id.* at 340, 343 (internal quotation marks omitted). The manager, who transferred the employee and ultimately terminated him, *id.* at 341, admitted knowledge of "legal concerns" but denied knowledge of the "nature of the legal concerns," *id.* at 343 (internal quotation marks omitted). We held that "the 'legal concerns' remark constitutes sufficient evidence to create a question of fact as to whether [the manager and the vice president] knew of [the employee's] protected activity." *Id.*

Consistent with *Bacon*, Cline has produced sufficient evidence from which "a reasonable jury could infer . . . that the supervisor knew of the protected activity at issue." *Mulhall v. Ashcroft*, 287 F.3d 543, 553 (6th Cir. 2002). Mack and Zava knew that Cline was involved in litigation with the company; the evidence permits the inference that the decision makers were unwilling to hire someone in litigation with the company; and under *Bacon* this evidence creates a triable issue of fact over whether the decision makers knew of Cline's protected activity. *Bacon*, 192 F. App'x at 343.

Something more is required, the company says, because Cline's evidence still does not show that the decision makers knew that the litigation involved an age-discrimination claim, and *Bacon* at all events is an unpublished decision. In one sense, the company has a point. Cline's evidence permits the inference that Mack and Zava would not hire someone—anyone—"in litigation" with the company, and that view might suggest unbiased neutrality. It thus might have made no difference to Mack and Zava whether the litigation involved age discrimination if they preferred not to hire anyone in litigation with the company without regard to the subject matter of the lawsuit—whether it was a tort action, a contract dispute or a civil rights complaint. But such an across-the-board explanation—that *any* litigation with the company precludes any individual from being hired (or for that matter being retained as a current employee)—would necessarily sweep up protected civil rights claims and non-protected claims. And if such an explanation suffices for one hiring decision, why couldn't an employer adopt a company-wide policy against hiring or retaining anyone in litigation with the company? As long as the policy were consistently followed, the employer would rarely have reason to obtain knowledge about the substance of the litigation, and at any rate it could always fairly say that it was the ruthlessly neutral policy, not the protected activity, that caused the adverse action. While we have no Tennessee case that tells us so, we doubt that the Tennessee courts would allow the State's anti-retaliation provision to be so easily evaded by the simple expedient of refusing to hire (or discharging) any individual with any litigation claim against the company. Two triable issues of fact thus exist: (1) Do the Mack and Zava statements (and any other relevant evidence) permit the inference that the company knew about the content of

Cline's claim against the company; and (2) do the Mack and Zava statements (and any other relevant evidence) permit the inference that the company had a policy against hiring (or retaining) individuals with litigation against the company?

Under the fourth element, the claimant must show "that there was a causal connection between the protected activity and the adverse employment action." *Newsom*, 924 S.W.2d at 96. Mack's testimony provides the requisite link: He reversed his decision to hire Cline because Zava "mentioned that we were in litigation with Mr. Cline and that he may not be the best person to do the training because of the litigation factor." That is not quite true, the company says. According to Zava, she told Mack to cancel the training because she wanted to conduct the training in-house, and she only "posed [to Mack] the rhetorical question of whether it was proper to subcontract with someone who was in litigation with BWXT." Even if Zava is correct and even if Mack misunderstood her, the fact remains that Mack "table[d]" the training because he understood Zava to say that Cline may not be the best person for the job based on the litigation, and he took action on that basis. A triable issue of fact thus exists on whether Cline's protected activity caused the company to change its hiring decision.

## III.

For these reasons, we affirm the district court's disposition of the failure-to-hire claims and reverse and remand the retaliation claim for further proceedings.