NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0138n.06

No. 13-1376

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 18, 2014
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SCOTT TRUJILLO, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) On Appeal from the United States |
| HENNIGES AUTOMOTIVE SEALING | ) District Court for the Eastern District |
| SYSTEMS NORTH AMERICA, INC., a | ) of Michigan |
| foreign corporation, d/b/a GDX Automotive, | ) |
| Inc., f/k/a GDX North America, Inc., | ) |
| | ) |
| Defendant-Appellee. | |

_____/

**Before: GUY, GIBBONS, and ROGERS, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiff Scott Trujillo appeals (for a second time) from the entry of summary judgment in favor of his former employer, defendant Henniges Automotive Sealing Systems North America, Inc. (Henniges), with respect to his claim of retaliatory discharge in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws Ann. § 37.2701. Agreeing with the district court's determination that plaintiff failed to make a prima facie showing of retaliation for having engaged in protected opposition activity, we affirm.

**I.**

Formed by a merger in late 2007, Henniges is a manufacturer of sealing and anti-vibration components for the automotive industry with plants located in the United States,

Europe, Asia and Mexico. Scott Trujillo, a Hispanic male of Mexican national origin, interviewed for a position as global financial director, and was hired into the newly created position of Corporate Controller. Trujillo was responsible for financial and tax matters for all of Henniges operations and reported directly to CFO Larry Williams, who, in turn, reported to CEO Rob DePierre. Trujillo started his employment in April 2008 and was discharged in September 2008.

Williams testified that he made the decision to discharge Trujillo based on dissatisfaction that Williams and others had with Trujillo's performance. As the district court detailed, there was evidence of recurring problems with the timeliness and accuracy of the weekly "flash" reports Trujillo was to submit to Williams, DePierre, and other senior management comparing the budgets and sales forecasts for twelve plants. Specifically:

> In an email dated May 8, 2008, Trujillo states, "Very sorry for the oversight" and attaches a revised flash report. On June 12, 2008, Trujillo sent another late and incomplete flash report. Based on the late reports, [CEO Rob] DePierre met with Williams and Trujillo to stress the importance and timeliness of the flash reports. Trujillo indicated he understood DePierre's concerns.
>
> On July 9, 2008, Trujillo sent out another incomplete flash report. The next week, he again sent out an erroneous flash report and sent out a revised flash report the next day. Trujillo admitted fault and stated, "Some of my numbers were incorrect there as well. Must have been a bad night." The same error occurred the next week, wherein Trujillo sent out another erroneous and incomplete report. As a result, DePierre sent Trujillo an email expressing his frustration:
>
>> Your explanation does not help. Do we or don't we have the ability to gain at Grefath [in Germany] and will we take income at the Czech? After three weeks I expect an answer. Please answer the question with an explanation. I'll look for the total answer tomorrow. Let me know if you cannot get the answer and I will get it myself.
>
> (Def's Mot. Summ. J. Ex. 6, ECF No. 44). Trujillo again submitted an inaccurate report on August 20, 2008. This time, Williams noticed the mistake and Trujillo apologized for his oversight: "I just wanted to acknowledge that I should be able

to get this thing right the first time. No excuses [sic] for the silly mistakes. It's like missing a lay-up (or an open net break-away since I know you're a hockey man)." (*Id*. at Ex. 9). Nonetheless, Trujillo submitted his report late the next week.

In addition, Trujillo submitted monthly reports involving the plants' financial results. Williams and DePierre testified that they were dissatisfied with Trujillo's reports because they were often incomplete and vague. Both Williams and DePierre were concerned with the timeliness of Trujillo's other work, as he was often behind schedule. Trujillo admits and apologizes for this in an email dated July 18, 2008. Williams also asserts that he was dissatisfied with Trujillo's presentation at a Controllers Conference in July 2008.

*Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc*. (On Remand), No. 09-13751, 2013 WL 811449, at *1-2 (E.D. Mich. Mar. 5, 2013). In a lengthy affidavit, Trujillo disputed the importance of the flash reports, minimized the significance of the errors, shifted blame for the monthly reports, and relayed that he received compliments from others for his presentation. Trujillo emphasized that Williams had praised his work developing a standardized financial report for use at all of the plants. Trujillo also conceded that DePierre made clear that the flash reports were "very important to him."

Williams testified that he had become consistently frustrated with Trujillo's performance by the end of June 2008, and that he and DePierre discussed their concerns in that regard in August 2008. The decision to fire Trujillo came after Williams received negative feedback, either directly or indirectly through DePierre, concerning the quality of the financial reports prepared for use by the executive team during the trip to Europe in early September 2008. In addition, Williams reviewed the financial report himself and agreed that it lacked a complete analysis of the data and, as a result, failed to convert the data into meaningful information.[1]

---

[1] David VanZoest, Vice President of Manufacturing and Continuous Development, explained that the report for the Grefrath plant was disorganized, difficult to understand, and included forecasts that had not been adequately vetted. VanZoest told plaintiff, "this is what I would have expected of you," and he later told Williams that he "didn't think [plaintiff] was capable of doing the job that they needed him to do."

Williams informed Geri Gasperut, Vice President for Human Resources, of his decision on or about September 10, 2008, and together they notified Trujillo of his discharge on September 15, 2008. The reason given was that Trujillo was "not 'a good fit.'" *Trujillo v. Henniges Auto Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 653 (6th Cir. 2012). But, when he pressed for an explanation, Trujillo was told that they were not happy with his performance.

Trujillo commenced this action in September 2009, and Henniges filed a motion for summary judgment a year later. The district court granted that motion in January 2011, finding that the first element of a prima facie case had not been established. A divided panel of this court affirmed in part and reversed in part, finding that Trujillo had made an informal complaint that could be construed to be protected opposition activity under Title VII. *Id.* at 655-56. On remand, the district court granted defendant's second motion for summary judgment on the grounds that plaintiff failed to establish the second and fourth elements of a prima facie case of retaliatory discharge. This appeal followed.

## II.

The district court's decision to grant summary judgment is reviewed de novo. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In making this determination, we must "view the evidence and draw all reasonable inferences in favor of the non-moving party." *Fuhr*, 710 F.3d at 673. For a genuine dispute to exist, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a) (opposition clause).  The Supreme Court recently clarified that unlike other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). When no direct evidence of retaliation is presented, a plaintiff may prove the claim with circumstantial evidence under the familiar burden-shifting framework of *McDonnell Douglas*.  *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).[2]

Plaintiff bears the initial burden of establishing a prima facie case of retaliation by showing:  (1) that he engaged in protected activity; (2) that the defendant decision maker knew of the exercise of that protected activity; (3) that an adverse employment action was subsequently taken against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Fuhr*, 710 F.3d at 674.  The district court found for a second time that plaintiff failed to demonstrate a prima facie case of retaliatory discharge.  This court held that the first element had been established, and there is no question that discharge is an adverse action that satisfies the third element.

## A.    Protected Activity

Trujillo claimed that he engaged in protected "opposition" activity by:  (1) directly opposing three racially or ethnically derogatory comments allegedly made in his presence by

---

[2]Trujillo refers to the ELCRA's comparable anti-retaliation provision, which we have analyzed under standards similar to those for claims under Title VII.  *Fuhr*, 710 F.3d at 673; *see also DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 664 (Mich. Ct. App. 1997).  Although this court did not mention the state law claim in remanding, there is no suggestion that our analysis would not apply equally to claims of retaliation under the ELCRA.

Larry Rollins, Director of North American Operations; and (2) making an informal after-dinner complaint about Rollins to Gasperut while they were in Europe during the first week of September 2008. Consistent with this court's decision in the first appeal, Trujillo does not (and cannot) claim that his responses to the three racially or ethnically oriented comments by Rollins were protected opposition activity because "Trujillo's own testimony makes clear that he did not complain to Rollins about the comments at the time they were made." *Trujillo*, 495 F. App'x at 654. We do not revisit that determination, but begin by discussing those three comments because it is necessary to understand the informal complaint to Gasperut that we found could be construed as protected opposition activity.

### 1. The Three Comments by Rollins

The first of Rollins' comments was made after a conference call in July 2008 with leaders of the plant in Guadalajara, Mexico, concerning a request by Volkswagen of Mexico for an audit that could result in a price reduction (and a loss of revenue to Henniges). After ending the call, a frustrated and angry Rollins shouted, "those fucking wetbacks." Plaintiff addressed Rollins in "a light hearted way," explaining that the term "wetback" did not actually refer to Mexican nationals in Mexico but to those who, like his family, came across the border into the United States. Describing Rollins as embarrassed and apologetic, Trujillo admitted "that he did not communicate that Rollins's comment offended him, let alone that he was complaining about the racial or ethnic character of the conduct." *Trujillo*, 495 F. App'x at 654.

The second comments came during the trip to Europe the first week of September 2008. Trujillo decided to approach Rollins to discuss difficulties that existed between Juan Perez, the controller of the plant in Guadalajara, Mexico, and Wayne Campbell, a friend of Rollins and the finance manager for both of the Mexican plants. Attributing the difficulties to Campbell's

aggressive management style, Trujillo asked if Rollins would talk to Campbell about "maybe softening his style with Juan" and suggested that a typical American or German manager's style is "very intimidating and very unnerving" to Latin American employees. Rollins interrupted him and said, "Fuck that cultural bullshit, Scott, and tell Juan to grow up." Trujillo testified that he understood Rollins to mean that Perez should "step up and not be so sensitive." Trujillo responded to Rollins by saying, "I'll talk with Juan about acclimating to Wayne's style and I'll try to keep the peace," and then "exited the conversation as quickly as [he] could.".

Finally, the third comment was made during a meeting on the same or the next day when "Rollins mentioned that he would be missing his son's football game but was not that upset since the team would be losing to a team of 'brothas.'" Trujillo testified that he corrected Rollins by asking whether he was referring to African Americans. Appearing annoyed, Rollins answered, "Yeah, Scott, the brothers." Rollins did not make a big issue out of it, and nothing else was said.

As we concluded in the first appeal, nothing in Trujillo's responses to Rollins could reasonably be construed as opposition to the alleged racial or ethnic character of the "wetback," "cultural bullshit," or "brothers" comments. *Trujillo*, 495 F. App'x at 654.

## 2. Complaint to Gasperut

Rather, this claim rests entirely on the informal complaint that Trujillo made to Gasperut after they attended a dinner with the executive team while in Europe during the first week of September 2008. This court found that Trujillo's informal complaint "can be construed as a complaint about a hostile work environment caused by racial and national origin discrimination." *Trujillo*, 495 F. App'x at 655. That dinner was attended by Trujillo, Gasperut, and the executive team consisting of Rollins and Vice Presidents David VanZoest, Rob Lithosit, and Howard Boyer. According to plaintiff, when the conversation turned to Perez and the Guadalajara plant,

Rollins and the others "were kind of beating up on the Mexican controllers and the Mexican staff." Rollins was very critical of the job they were doing and conceded that he probably said Perez was "fuckin' worthless." Trujillo said nothing to anyone directly. Instead, while walking back from dinner with Gasperut, Trujillo "sa[id] something to her about Rollins' continued—I say continued because it's happened more than once—choice to say inappropriate or derogatory things about other races."

It was this characterization of plaintiff's complaint that we found could satisfy the first element of the prima facie case. However, we also expressly declined to reach the separate question of whether Gasperut could have understood this complaint to be about racial or national origin bias. We explained that her understanding of the complaint would instead be relevant to other elements of the prima facie case: namely, "whether Henniges and its executives were aware of Trujillo's protected activity, or whether the protected activity is causally connected to Trujillo's termination." *Id*. at 656. Accordingly, we remanded for the district court to consider the other elements of the prima facie case in the first instance.

**B.     Defendant's Knowledge**

Trujillo must demonstrate that the defendant had knowledge of his protected activity prior to taking the adverse employment action. *Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 513 (6th Cir. 2008); *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002). In most cases, "the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's protected activity." *Mulhall*, 287 F.3d at 552. Awareness of the protected activity may also be established by producing circumstantial evidence—other than the challenged adverse action—from which a reasonable jury could infer the decision maker's knowledge. *Id*. at 552-53 (discussing cases).

Since there is no evidence that Williams was aware of this alleged protected activity at the time he made the decision, plaintiff contends: (1) that Williams' knowledge may be imputed because Gasperut must have participated in the decision; or (2) that Gasperut conveyed her knowledge to one or more members of the executive team who, in turn, acted with retaliatory animus by providing negative feedback to Williams with the intention of causing plaintiff's discharge. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) ("cat's paw" theory). The first hurdle under either theory is to determine what a reasonable jury may infer about Gasperut's knowledge.

### 1. Complaint to Gasperut

Plaintiff contends that it was error for the district court to look beyond his own testimony that he complained about Rollins' "continued . . . choice to say inappropriate or derogatory things about other races." On the contrary, the district court properly considered all the testimony in determining what inferences could be drawn from the evidence in finding that Trujillo's own testimony belied the claim that the comment to Gasperut actually mentioned "race."

First, Trujillo acknowledged that he did not specifically mention the "wetback" or "brothers" comments that he found objectionable, saying, "I'm certain I didn't mention those to her." In addition, despite this court's suggestion to the contrary, the record supports the district court's determination that neither the "cultural bullshit" comment nor the "brothers" comment was made during the dinner that preceded Trujillo's informal complaint. *Trujillo*, 2013 WL 811449, at *5.

Second, Trujillo explained that he brought up the topic of Rollins' comments in "general terms," and "did not represent it in any other way than, I don't think it's appropriate, and I'm not

comfortable with his expressions involving these types of comments." When asked specifically what he said to Gasperut, Trujillo answered:

> I recall—and I can't say specifically. I can't quote myself, but I recall making a choice to say something to her about Rollins' continued—I say continued because it's happened more than once—choice to say inappropriate or derogatory things about other races. I said that to her, and I don't recall what she said to me, to be honest with you. It was a very quick conversation.

While this testimony demonstrates that Trujillo *intended* to complain that Rollins made derogatory comments about other races, it is less than clear what he actually communicated to Gasperut.

Plaintiff argues that the question is settled by Gasperut's testimony that, as they were walking back from dinner, plaintiff "made a comment to [her] that Larry [Rollins] made some uncomfortable comments about Mexicans, and it was bothering him." Although this statement does leave room for interpretation, the rest of Gasperut's testimony does not.

> Q: You indicated that [Trujillo] was concerned about how Larry Rollins was speaking to or about Mexicans?
>
> A: Right.
>
> Q: Did he give you any particulars?
>
> A: No, not really. He just said that it was uncomfortable, or it was beginning to be uncomfortable, or something like.
>
> Q: Did he suggest that he thought that Larry Rollins was not sensitive to the Mexican culture, and that was the source of Scott's concern?
>
> A: Not to me, no.
>
> Q: So it was just sort of generally how he was talking to you?
>
> A: Right. And, you know, I was at the table, too, and so I know that there were comments made about the performance of the controller at Guadalajara, and so I thought that that was what he was talking about.
>
>   . . . .

Q:  And what did Larry say, specifically, if you remember?

A:  Larry's comments were about the controller in Mexico, Juan [Perez], and his incompetence, right?  So I guess my initial thought was that Scott was uncomfortable with the fact that there was always these derogatory comments about those guys' performance and this guy, and that's when I formulated my, you know, or I decided to address it and tell them to knock it off.  I was really talking about inappropriate comments about people and things that happen in the company.  I really was not thinking about, you know, the fact – I didn't think that we were talking about national origin or race or anything like that.

I thought we were talking about the fact that he was picking on this guy and doing it in an uncomfortable fashion.  I don't know if that clarifies it.

There can be no uncertainty about what Gasperut says she understood.

More importantly, as the district court observed, Trujillo conceded that it was absolutely reasonable for Gasperut to have misunderstood his concern and assumed from their brief conversation that he was referring to the dinner conversation.  Although this concession does not rise to a binding admission that this element cannot be satisfied, plaintiff cannot avoid the conclusion that he did not convey a complaint about the racial or ethnic nature of Rollins' comments in the passing complaint to Gasperut.  The relevant passage is repeated in full because plaintiff claims that the defendant "surgically cut selected phrases" from his deposition testimony to support this conclusion.

Q:  I believe you were here for this testimony as well.  I believe that Geri testified that she understood your concerns to relate more to sort of the unprofessionalism of the comments, you know, questioning the professionalism of the controllers and the abilities of the controllers who happened to be Mexican, not necessarily that you were concerned that they were making racist comments.

A:  Right.

Q:  Is that correct?

A:  I understood the testimony the same way.  That was not my intention. I would say that it was clear from the testimony – and again, that testimony was the first time that I learned that she had actually talked about my concerns with them, but

it was clear during that testimony that she gave that I think she misunderstood what I was referring to.

I think she made an assumption about some conversation the night prior at dinner where they were – they being mostly prompted by Rollins, but Rollins and the other guys were involved in a discussion where they were kind of beating up on the Mexican controllers and the Mexican staff. She had suggested that it was about Juan specifically. I don't recall that being the case. I recall it being a little more general than that. But I don't recall mentioning the dinner conversation when I spoke to Ms. Gasperut.

Q: But you mentioned that your conversation with Ms. Gasperut was very brief?

A: Yes.

Q: It was just kind of a quick, off-hand thing?

A: Yes.

Q: Is it understandable that she may have misunderstood the conversation and made that assumption?

A: Absolutely. I don't believe that she intentionally ignored any plea or message I gave. I believe that she made a reasonable mistake in assuming that I was just referring to the dinner conversation.

Trujillo believed that Gasperut had reasonably assumed his complaint was about the harsh and admittedly profane criticisms of the performance of Perez and others at the Mexican plant. We agree with the district court that this testimony undermines the characterization that Trujillo's complaint actually mentioned "race." More importantly, it concedes that his complaint failed to convey opposition to the racial or ethnic nature of Rollins' comments in a way that Gasperut should have recognized.

**2. Gasperut's Warning**

Next, plaintiff contends that we may infer Gasperut's knowledge from the fact that she cautioned Rollins and the others the next morning to "watch what you say." Gasperut explained that an off-hand comment is not necessarily harassment and plaintiff did not ask her "to make a

big deal out of it." She added that she did not have a "right to keep a secret like that," but had "an obligation to deal with it" without making a "bigger deal out of something that wasn't a big deal." Gasperut testified that she spoke briefly to Rollins, VanZoest, and Lithosit as they gathered in the morning. She cautioned them to be careful about what they say at the dinner table after a couple of beers, explaining:

> You have to be careful what you say and you have to recognize that there are people that are around you from time to time that are, you know, not part of your regular circle, and you've got to be aware of what you say, when you say it, how you say it, and how it might affect others, and so please be careful.

In other terms, Gasperut explained that she said,

> You can't always know your audience well enough to know what will bother people and what won't bother people, so just be careful what you say and keep your comments – I mean, don't make any comments that suggest any, I don't know, bias, or something like that. I didn't specifically say national origin or protected class or anything like that. I just said, Try not to be offensive to the people that are around you.

Neither the statement that Gasperut felt an obligation to say something about the discussion that had made plaintiff uncomfortable, nor the fact that she cautioned members of the executive team not to be offensive, undermines the evidence that Gasperut did not understand plaintiff to be complaining about bias based on race or national origin.

Finally, plaintiff argues that knowledge may be established for purposes of the "cat's paw" theory because there is circumstantial evidence that Gasperut's warning nonetheless signaled to Rollins and the others that plaintiff had engaged in protected activity. That is, plaintiff argues, when Gasperut referred to people outside their "regular circle" who could be offended, and since the "brothers" comment occurred in their presence, the executive team could have thought the warning was because Trujillo had complained to her. Gasperut denied that she indicated as much, either implicitly or explicitly, and said she "made it sound like [she] was the

one who picked up that they were maybe a little insensitive the night before and that they needed to watch that in the future." Indeed, Gasperut was also not part of their "regular circle." Rollins testified that he thought Gasperut had taken offense at his use of profanity during dinner the night before, and both he and Lihoset testified that they took the admonition as a reminder about maintaining professionalism during dinner meetings. The evidence is not sufficient to permit an inference that members of the executive team intuited from the warning that plaintiff had engaged in protected opposition activity.

### 3. *Cline* and *Bacon*

Nor is a contrary conclusion dictated by this court's determination in both *Cline* and *Bacon* that circumstantial evidence permitted an inference that the decision maker was aware of the protected activity. In *Cline*, an offer of employment was withdrawn after the decision maker was told by a supervisor that the company was "in litigation with Mr. Cline and that he may not be the best person to do the [job] because of the litigation factor." 521 F.3d at 513. Unlike this case, a reasonable jury could infer awareness of the protected activity when the supervisor suggested withdrawing a job offer because the plaintiff was in litigation with the employer.

In *Bacon*, which was discussed in *Cline*, the plaintiff had engaged in numerous instances of protected activity by making internal complaints about race discrimination, filing multiple civil rights charges, and participating in two lawsuits asserting class claims of race discrimination. *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 343 (6th Cir. 2006). One of many adverse actions at issue was a transfer to a new position which was made at the suggestion of a vice president who also added that there were "legal concerns." *Id*. at 340. This court found that the remark by the vice president to the manager in connection with the transfer was sufficient to create a question of fact whether the decision maker knew of the plaintiff's

protected activity. *Id*. at 343.

Here, what Trujillo conveyed to Gasperut was a brief, non-specific complaint expressing generalized discomfort with comments by Rollins that Gasperut reasonably assumed to refer to the harsh and profane ranting they had both just witnessed during dinner about the competence (or lack thereof) of the controller and other staff at the plant in Mexico. Neither the evidence concerning what was actually said during the brief exchange, nor what was conveyed by Gasperut's warning, could lead a reasonable juror to conclude that Gasperut, or one or more members of the executive team, knew Trujillo had engaged in protected opposition activity. The district court did not err in finding that plaintiff failed to satisfy the second element of the prima facie case. *Trujillo*, 2013 WL 811449, at *6.

**AFFIRMED.**