RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GIANNI-PAOLO FERRARI,

>*Plaintiff-Appellant,*

*v.*

No. 15-1479

FORD MOTOR COMPANY,

>*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-14857—Judith E. Levy, District Judge.

Argued: March 10, 2016

Decided and Filed: June 23, 2016

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charlotte Croson, NACHTLAW, P.C., Ann Arbor, Michigan, for Appellant. Julia Turner Baumhart, KIENBAUM OPPERWALL HARDY & PELTON, P.L.C., Birmingham, Michigan, for Appellee. **ON BRIEF:** Charlotte Croson, NACHTLAW, P.C., Ann Arbor, Michigan, for Appellant. Julia Turner Baumhart, KIENBAUM OPPERWALL HARDY & PELTON, P.L.C., Birmingham, Michigan, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. This case raises claims of unlawful employment discrimination—claims that return us to the distinctions our case law draws between the tests governing claims based on direct evidence of discrimination and those based on indirect

1

evidence.  In February 2013, Ford Motor Company temporarily bypassed Gianni-Paolo Ferrari for a skilled trades apprenticeship.  Ferrari alleges that Ford's decision was unlawful discrimination under the Americans with Disabilities Act (ADA) and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), and retaliation under the Family Medical Leave Act (FMLA).  The district court granted summary judgment to Ford.  We affirm, though we do so by applying the tests and following the analysis specified by our precedent.

## I.  BACKGROUND

Ford Motor Company hired Ferrari in 1996.  He initially worked in assembly and was a member of the United Auto Workers (UAW).  He is still employed by Ford.

In 2000, Ferrari suffered a neck injury at work, placing him on medical leave from June 2001 to April 2003.  After Ferrari returned from medical leave, Ford accommodated his restrictions for the next nine years by placing him in various light-work positions.  The last of these placements was in a human resources office.

During this period, Ferrari applied for and received leave under the FMLA four times.  At least two of the FMLA requests stemmed from his neck injury.  The fourth, in summer 2012, was for stress and major depression, which Ferrari attributed to his immediate supervisor in the human resources department.

On November 21, 2012, while Ferrari was still on medical leave, his pain management doctor, Dr. William Kole, agreed to remove his work restrictions.  Until that point, Ferrari's restrictions had been classified as "permanent."  In December, he returned from FMLA leave and testified that he was feeling better and wanted to get back to work.  Ferrari was also hopeful that he would soon be able to leave the human resources office, as Dr. Kole had removed his restrictions, and he had heard a rumor that he might be called to apprentice in the trades.

On December 3, 2012, Dr. Arthelia Brewer, one of Ford's company doctors, conducted a physical to determine whether Ferrari could return from medical leave.  Dr. Brewer cleared Ferrari to return from psychiatric medical leave.  Ferrari also asked Dr. Brewer to lift the restrictions tied to his neck injury.  According to Dr. Brewer's notes, Ferrari told her that "he

requested the restrictions be lifted [by Dr. Kole] when an opportunity arose for him to go into skilled trades." (R. 37-1, PageID 1102.)

Dr. Brewer decided to maintain Ferrari's restrictions pending further testing and review. In her notes, she expressed a need to ascertain "why the restrictions were suddenly removed especially since [Dr. Kole's] most recent progress notes to date found his [sic] disabled and the ongoing need for narcotic medications." (R. 37-1, PageID 1103.) With regard to the latter concern about opioids, Dr. Brewer's notes indicated that on December 21, 2005, another doctor had found that Ferrari was "latrogenically addicted to narcotics" and determined that he could not "return to his employment at [Ford] while he is on these narcotics." (*Id.*) In her treatment plan, Dr. Brewer stated that she would obtain additional medical records, including Ferrari's most recent MRI reports, and contact Dr. Kole to clarify his decision. She also ordered new MRI and EMG/NCS tests.

Ferrari testified that on December 17, 2012, the UAW informed him of two skilled trades apprenticeships in refrigeration maintenance (RMI apprenticeship) at the Van Dyke plant. There is a wait list for apprenticeship positions, and the collective bargaining agreement between UAW and Ford provides that any apprenticeship shall go to the person who is highest on the wait list, as long as he or she is deemed qualified. Ferrari's position on the wait list guaranteed him one of the two RMI apprenticeships if he passed a pre-apprenticeship physical.

Ferrari's pre-apprenticeship physical was scheduled for January 16, 2013, with Dr. Brewer. In advance of this physical, Ferrari obtained clearances from two other doctors—Dr. David Calton and Dr. Michael Louwers—and a functional capacity evaluator, David Brown. Although Dr. Calton and Dr. Louwers both concluded that Ferrari's neck injury no longer required physical restrictions, they did not address Ferrari's opioid use. Dr. Calton's chart entry indicated that Ferrari was still actively using opioids, but did not address whether the opioids could affect his performance on the job. Dr. Louwers's letter did not mention Ferrari's opioid use at all.

Dr. Brewer conducted Ferrari's pre-apprenticeship physical on January 16, as scheduled. Ferrari brought the clearances from Dr. Calton and Dr. Louwers to the appointment.[1] In her notes, Dr. Brewer observed that Dr. Kole had not responded to her inquiry as to "what changed to warrant dropping all restrictions after 9 years." (R. 37-7, PageID 1140.) She also noted that Ferrari's medical records indicated that he was still using opioids. On his pre-apprenticeship medical questionnaire, however, Ferrari stated that he had already weaned off opioids. Dr. Brewer decided to "[m]aintain [Ferrari's] existing restrictions pending further evaluation." (*Id.*) To that end, she resolved to obtain a job description for the RMI position, follow up with the functional capacity evaluator, obtain further information on Ferrari's opioid use, and schedule an independent medical examination with a neurosurgeon.

On February 7, 2013, Dr. Brewer sent a letter to Dr. Kole in which she provided the job description for the RMI apprenticeship and inquired about whether Ferrari could "safely execute the tasks required while taking [opioids]." (R. 36-16, PageID 977.) According to the job description, RMI apprentices must climb 30-50 foot ladders and open and close large overhead valves; the RMI apprenticeship supervisor, Thomas Ternan, also testified that they must work at heights on overhead catwalks and mobile elevated work platforms. In his reply, which Dr. Brewer did not receive for another three or four weeks, Dr. Kole said that Ferrari was not addicted to opioids, that it would take three to four months to wean off the opioids, and that the opioids did not affect Ferrari's physical performance, mental clarity, or cognitive functioning. Dr. Kole concluded that Ferrari was "safely able to perform all functions listed in the RMI job description." (*Id.*)

Dr. Brewer also scheduled an independent medical examination with Dr. Phillip Friedman for January 29, 2013, which both parties acknowledged as binding. Dr. Brewer received Dr. Friedman's report sometime between February 14 and February 21. In the report, Dr. Friedman determined that from "a purely objective physical perspective," Ferrari was "able to perform the tasks described as a RMI tradesman without restriction." (R. 37-5, PageID 1134.) He also acknowledged that Ferrari claimed to have been off opioids for three months. Dr. Friedman pointed out, however, that Ferrari's claim was not substantiated by his medical records

---

[1]After the physical, Ferrari also obtained a clearance from Dr. Vittorio Morreale on January 31, 2013.

because "as of January 7, 2013 he reported to Dr. Calton that he [was] still on Diazepam, Morphine, and Kadian." (R. 37-5, PageID 1133.) Accordingly, Dr. Friedman concluded, if Ferrari "currently remains on opioids"—as the medical records indicated—he "would not allow [Ferrari] to resume unrestricted employment" because "the use of opioids may affect his performance." (R. 37-5, PageID 1134.)

On February 27, 2013, Dr. Brewer removed two of Ferrari's four restrictions. Based on Dr. Friedman's report and the other clearances, Dr. Brewer concluded that Ferrari was "able to work without restrictions from a physical perspective." (R. 37-2, PageID 1106.) However, pursuant to Dr. Friedman's recommendation, Dr. Brewer maintained the ladder-climbing and overhead-work restrictions "until Mr. Ferrari is taken off the prescribed opioids which, per Dr. Kole, will take approximately 3-4 months," clarifying that the overhead-work restriction would be "synonymous with no working at heights." (*Id.*) She also noted that Ferrari would be "reassessed in 3-4 months to monitor the progress of weaning him from these medications" and "[i]f this process is successful and documented, the remaining restrictions will be removed." (*Id.*)

The RMI apprenticeship supervisor, Tom Ternan, reviewed Ferrari's two restrictions to determine whether he could participate in the program. Ternan concluded that Ferrari's restrictions precluded him from participating in the apprenticeship "[b]ecause having the ability to work overhead and climb ladders on a daily basis are essential to performing any RMI job." (R. 33-11, PageID 801.) "While an apprentice could, theoretically and occasionally, stay on the ground while a supervising journeyman climbed the ladder," Ternan explained further, "[t]he climbing of the ladder is essential to learning the task to be performed at the top of the ladder, which is also an essential function of the position, whether it be checking fluid levels, venting fluids, mixing chemicals, monitoring or repairing HVAC equipment, opening or closing a multitude of valves, sometimes on an emergency basis to prevent an explosion, or the like." (R. 33-11, PageID 801-02.) Ternan's supervisor, Rob Shaver, also signed off on this decision.

After Ternan and Shaver concluded that Ferrari could not participate in the apprenticeship program, the labor relations supervisor, Linda Beggs, contacted the UAW representative, who informed her that the collective bargaining agreement had a provision for

temporarily "bypassing" candidates whose medical restrictions prevent them from performing essential functions of an apprenticeship. Ferrari was temporarily bypassed for the RMI apprenticeship in February 2013. Another candidate filled the RMI opening in March 2013.

Ford placed Ferrari in a machining associate position that met his restrictions. In September 2013, Ferrari notified the Joint Apprenticeship Committee that his restrictions had expired. He is first on the wait list for an apprenticeship at the Van Dyke and Sterling plants.

Ferrari sued Ford in November 2013 for violations of the ADA, PWDCRA, and FMLA. In October 2014, Ford moved for summary judgment on his claims. The district court subsequently ordered supplemental briefing on whether the case involved the direct or indirect method of proving a disability claim, the correct standard under each method, and whether Ferrari had satisfied the relevant standard. In March 2015, the district court granted Ford's motion for summary judgment. This appeal followed.

## II. ANALYSIS

We review *de novo* the district court's grant of summary judgment. *Cass v. City of Dayton*, 770 F.3d 368, 373 (6th Cir. 2014). Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact for trial. Fed. R. Civ. P. 56(a); *Cass*, 770 F.3d at 373.

### A. Disability Discrimination

To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc) (abrogating *Monette* in part by holding that a plaintiff must show that he or she suffered an adverse employment action "because of" rather than "solely by reason of" disability). A plaintiff may do so "by introducing direct evidence of discrimination, including evidence that the employer relied

upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination." *Monette*, 90 F.3d at 1178 (citation omitted).

The direct method mirrors the requirements listed above. If there is direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then "bears the burden of establishing that he or she is 'disabled'" and "'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation." *Monette*, 90 F.3d at 1186. Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that a challenged job criterion is essential . . . or that a proposed accommodation will impose an undue hardship upon the employer." *Id.*

The indirect method adapts the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Monette*, 90 F.3d at 1179-82. To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Id.* at 1186; *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (reaffirming that "*Monette* states the proper test" under the indirect method). Once the plaintiff establishes a *prima facie* case under the indirect method, the burden shifts to the defendant to "offer a legitimate explanation for its action." *Monette*, 90 F.3d at 1186. If the defendant does so, the burden then shifts back to the plaintiff, who "must introduce evidence showing that the proffered explanation is pretextual." *Id.*

"Distinguishing between cases that involve direct evidence of discrimination and those in which the plaintiff is not able to introduce direct evidence is vital because the framework for analyzing the two kinds of cases differs." *Id.* at 1184. When an "employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision . . . [t]he *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant . . . and

the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Id.* at 1182 (citation omitted).

The district court appears to have analyzed the present case under the direct method alone. Ferrari, however, alleged two claims for disability discrimination: a claim under the direct method based on his opioid use, and a claim under the indirect method based on his neck injury. The district court's determination that Ferrari's opioid use was not a disability under the ADA—and thus that he lacked a claim for disability discrimination under the direct method—resolved the first claim but not the second. For the reasons stated below, we nevertheless affirm the district court's decision to grant summary judgment, because Ferrari's disability discrimination claims fail under both the direct and indirect methods.

### 1. Direct Method

Dr. Brewer's stated reason for imposing the February 2013 restrictions was Ferrari's continued use of opioids, and Ford based the temporary bypass decision on these restrictions. Ferrari does not present any other direct evidence regarding Dr. Brewer's restrictions or Ford's temporary bypass decision.[2] To proceed under the direct method, then, Ferrari needed to show that opioid use is a disability under the ADA and that he was "otherwise qualified" for the RMI apprenticeship despite his continued opioid use. *Monette*, 90 F.3d at 1186. His claim fails at this first step.

Under the ADA, the term "disability" means a physical or mental impairment that substantially limits one or more major life activities of an individual; a record of such an impairment; or being regarded as having such an impairment. 42 U.S.C. § 12102(1). Ferrari contends that Ford regarded him as disabled because of his opioid use.

"The regarded-as-disabled prong of the ADA protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (quoting

---

[2]Although the parties do not dispute the district court's holding that Ferrari's neck injury was a record of disability under the ADA, Ferrari did not present any direct evidence of disability discrimination based on this injury.

*Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)) (internal quotation marks omitted). "Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities." *Id.* at 704 (quoting *Gruener*, 510 F.3d at 664) (internal quotation marks omitted). Major life activities include, but are not limited to, "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i).

Ferrari does not specify which "major life activity" Ford believed was limited by his opioid use. He does challenge Ford's conclusion that the opioid use precluded him from working certain jobs. It would seem, then, that Ferrari is arguing that Ford mistakenly believed that his opioid use substantially limited him in the major life activity of "working."

In *Daugherty*, we considered a regarded-as-disabled claim in which the employer "believed that [the plaintiff's] back condition and current medication levels precluded him from performing the dangerous machinery functions required of [a] particular job," but informed the plaintiff that he would be considered for the job "if his medication levels were reduced or eliminated." 510 F.3d at 706. We observed that where the major life activity at issue is working,

> the statutory phrase "substantially limits" takes on special meaning . . . and imposes a stringent standard, requiring proof that the employer regarded the employee as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

*Id.* at 704 (internal quotation marks omitted). Given this stringent standard, we held that the plaintiff had failed "to establish a *prima facie* regarded-as-disabled discrimination claim . . . that implicates the major life activity of working." *Id.* at 706. "The inability to perform a single,

particular job," we explained, "does not constitute a substantial limitation in the major life activity of working." *Id.* at 704.[3]

The present case is analogous to *Daugherty*.  Ford concluded that Ferrari's opioid use restricted him from working jobs that required ladder climbing or working at heights.  Ford cleared Ferrari to work in any job that did not require those activities, and in fact placed him in both clerical and assembly positions.  Moreover, like the employer in *Daugherty*, Ford only barred Ferrari from a single, particular job—the RMI apprenticeship—and told Ferrari that he would be eligible for the job once he had weaned off opioids.  Thus, as in *Daugherty*, the evidence does not show that Ford regarded Ferrari's opioid use as a substantial impairment on the major life activity of working.  Ferrari's claim therefore fails under the direct method.

### 2.  Indirect Method

As stated above, under the indirect method, Ferrari must first establish a *prima facie* case of discrimination by showing that (1) he is disabled, (2) he was otherwise qualified for the RMI position, with or without reasonable accommodation, (3) he suffered an adverse employment decision, (4) Ford knew or had reason to know of his disability, and (5) the RMI apprenticeship remained open while Ford sought other applicants.  *Monette*, 90 F.3d at 1186; *Whitfield*, 639 F.3d at 259 (reaffirming that "*Monette* states the proper test" under the indirect method).  Establishing a *prima facie* case of discrimination under the indirect method is "not onerous." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If Ferrari satisfies this burden, the burden shifts to Ford to offer a legitimate explanation for its decision to temporarily bypass Ferrari for

---

[3]The same standard applies for the PWDCRA.  *See Salim v. MGM Grand Detroit, L.L.C.*, 106 F. App'x 454, 458-59 (6th Cir. 2004) (applying standard to a case with both ADA and the PWDCRA claims); *Degiuli v. City of Taylor*, No. 317681, 2014 WL 7338890, at *5 (Mich. Ct. App. Dec. 23, 2014) ("While work may constitute a major life activity [under the PWDCRA], the inability to perform a particular job does not constitute a substantial limitation.  Rather, the perceived condition must significantly impair plaintiff's ability to perform at least a wide range of jobs." (internal quotation marks and citations omitted)); *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 478, 606 N.W.2d 398, 407-08 (1999) (same); *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 763-64 (6th Cir. 2012) (observing that the PWDCRA "substantially mirrors the ADA" and using ADA definitions to determine whether plaintiff was regarded as disabled); *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 461-63 (6th Cir. 2011) (same).

the RMI apprenticeship.  *Monette*, 90 F.3d at 1186.  If Ford does so, the burden then shifts back to Ferrari, who "must introduce evidence showing that the proffered explanation is pretextual." *Id.*

In *Monette*, we unequivocally held that the above five-element test is the proper test for establishing a *prima facie* case under the indirect method.  But despite *Monette*, some cases in this circuit appeared to use a three-element test instead of this five-element test.  In *Whitfield*, we addressed this apparent inconsistency, holding that *Monette* "states the proper test."  639 F.3d at 259.  The line of cases using a three-element test, we explained, stemmed from a misreading of *Monette* in *Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002).  Specifically, "*Monette* is cited for the formulation used in *Mahon*, and although *Monette* includes the three-element language, it is not used in the context of establishing a *prima facie* cases for purposes of *McDonell Douglas*, but is rather in the context of what is required for *recovery* under the ADA."  *Whitfield*, 639 F.3d at 259.  "Because conflicts between published cases are resolved in favor of the earlier case, we adopt[ed] *Monette*'s five-element test for a *prima facie* case of employment discrimination under the ADA."  *Id.* (citing *United States v. Allen*, 619 F.3d 518, 524 n.2 (6th Cir. 2010).[4]

In most cases decided after *Whitfield*, panels in this circuit have used the five-element *Monette* test.  *See, e.g.*, *Neely v. Benchmark Family Servs.*, No. 15-3550, 2016 WL 364774, at *3 (6th Cir. Jan. 26, 2016); *Hurtt v. Int'l Servs., Inc.*, No. 14-1824, 2015 WL 5332531, at *4 (6th Cir. Sept. 14, 2015); *Yarberry v. Gregg Appliances, Inc.*, No. 14-3960, 2015 WL 5155553, at *6 (6th Cir. Sept. 3, 2015); *White v. Standard Ins. Co.*, 529 F. App'x 547, 549 (6th Cir. 2013); *Roetter v. Michigan Dep't of Corr.*, 456 F. App'x 566, 569-70 (6th Cir. 2012).  In some cases, however, we have continued to cite the line of authority we rejected in *Whitfield*.  *See, e.g.*, *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008), which relied on *Mahon*); *see also Boileau v. Capital Bank Fin. Corp.*, No. 15-5820, 2016 WL 1622349, at *4 (6th Cir. Apr. 25, 2016) (citing *Demyanovich*); *Blazek v. City of Lakewood*, 576 F. App'x 512,

---

[4]We also noted in *Whitfield* that using the three-element test for the indirect method would "make[] little sense, as its third element—whether the employee was, in fact, discharged because of disability—requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." *Id.*

516 (6th Cir. 2014) (citing *Demyanovich*). These cases rely on *Mahon*'s misreading of our published precedent, *Monette*, an error we corrected in *Whitfield*. Since these cases use the three-element test from *Mahon*, they should not be cited for the *prima facie* test under the indirect method. The five-element test previously articulated in *Monette* remains the proper test.

As occurred in *Whitfield*, the district court here "used the incorrect *Mahon* formulation of a *prima facie* case" under the indirect method and, therefore, "[t]here [was] no decision below . . . on whether [the plaintiff] ha[d] made out a *prima facie* case of employment discrimination under the correct framework." 639 F.3d at 261. And also like *Whitfield*, the district court here considered the defendant's legitimate, non-discriminatory reason for the adverse action (i.e., Ferrari's continued opioid use) at the *prima facie* case stage. *Id.* Faced with this situation in *Whitfield*, we assumed that the plaintiff "ha[d] made out a *prima facie* case" under the correct test and, finding that the plaintiff could not demonstrate a genuine dispute of material fact as to pretext, affirmed the district court's decision to grant summary judgment. *Id.* at 261-62. The same analysis is appropriate here. Assuming a *prima facie* case under the correct test, we affirm because Ferrari has not raised a genuine dispute of material fact as to pretext, as explained below.

Dr. Brewer's stated reason for imposing restrictions on Ferrari was his opioid use, and Ford temporarily bypassed Ferrari for the RMI position because of these restrictions. Ferrari's restrictions—and the medical condition underlying them—are a legitimate, nondiscriminatory explanation for Ford's adverse employment decision. The burden thus shifts to Ferrari, who "must introduce evidence showing that [Ford's] proffered explanation is pretextual." *Monette*, 90 F.3d at 1186.

To survive a motion for summary judgment, Ferrari need not definitively prove that Ford's reason is pretextual, but rather "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield*, 639 F.3d at 260. "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400

(6th Cir. 2009)); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998) (reciting same standard in ADA case).

This circuit has employed a version of the "honest belief" rule with regard to pretext. The formulation used provides that as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken. *See Smith*, 155 F.3d at 806; *see also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (citing *Smith* for the honest belief rule). "[T]he focus of a discrimination suit is on the intent of the employer," so "[i]f the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Id.* But to prove that the offered, non-discriminatory basis for the employment action is "honestly held," "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807. Once the employer shows that it "made a reasonably informed and considered decision before taking an adverse employment action," "the employee has the opportunity to produce proof to the contrary." *Id.* (internal quotation marks omitted).

Ferrari has failed to present evidence creating a dispute of material fact as to whether the RMI apprenticeship decision-makers honestly believed that his restrictions reflected a reasonable medical judgment. Dr. Brewer imposed Ferrari's restrictions, but she was not the final decision-maker with regard to the RMI apprenticeship. Rather, it was Ternan and Shaver who made this decision.[5] Ferrari also failed to present evidence creating a dispute of material fact as to whether Dr. Brewer herself honestly believed that he was using opioids or honestly believed that the opioids could affect his performance, creating a danger to him and other employees. Dr. Brewer's evaluation of Ferrari's opioid use was thorough. She conducted two examinations of Ferrari, reviewed his medical history, obtained his most up-to-date medical records, ordered new

---

[5]Although Ferrari does not say so, it could be argued that he is asserting a "cat's paw" theory of liability to impute Dr. Brewer's alleged discriminatory animus to Ternan and Shaver. *See Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) ("In a cat's paw case, the plaintiff seeks to hold [an] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." (internal quotation marks omitted)). Even if Ferrari had asserted such a theory, however, it would not help his claim, because he has not presented evidence that Dr. Brewer was motivated by discriminatory animus.

tests, ordered an independent medical examination to resolve discrepancies in his medical record, and revised his restrictions based on this new information.

We are unpersuaded by Ferrari's arguments as to why Ford's explanation was pretextual. Ferrari claims that he had ceased using opioids when Dr. Brewer imposed restrictions, but he has not presented evidence creating a dispute of fact as to whether Dr. Brewer honestly believed he was using opioids. His medical record indicated that he was addicted to opioids and was still "actively" using them. Ferrari also does not provide sufficient evidence to challenge Dr. Friedman's independent medical examination, which the parties agreed was binding. That eleven-page report concluded (a) that the medical record did not substantiate Ferrari's claim to have weaned off opioids, and (b) that opioid use could affect his performance. Ferrari points to Dr. Kole's letter, which said that the opioids did not affect Ferrari's performance and concluded that Ferrari was "safely able to perform all functions listed in the RMI job description." (R. 35-15, PageID 977.) But Dr. Kole's letter does not rise to the level of a material dispute because it lacks medical explanation, and Dr. Kole admitted in his testimony that "the only way [he] would know whether the opioids were impairing [Ferrari] either physically or mentally was if [Ferrari] told [him]." (R. 33-7, PageID 772.)

Ferrari also points to evidence outside his medical record that, he claims, shows that Ford's explanation was pretextual. He references the beginning of an email in which Dr. Brewer discusses an inquiry from workers' compensation about whether lifting restrictions would change his date of injury, seeking to imply that workers' compensation personnel were against lifting his neck-injury restrictions and that Dr. Brewer was sympathetic to those concerns. But the rest of Dr. Brewer's email explains the workers' compensation position differently, showing that such a conclusion is unwarranted. The email concludes, moreover, with Dr. Brewer's primary medical concern: the potential side effects of opioids on Ferrari's ability to perform the RMI trades position. Ferrari also challenges Ford as changing its explanation for the adverse employment decision, but Dr. Brewer revised Ferrari's restrictions *before* Ford made the adverse employment decision and, more importantly, she did so pursuant to the recommendation of an independent medical examination that the parties agreed was binding. Lastly, Ferrari claims that Dr. Brewer "hid" Ford's medical records from him because she did not release them immediately

when they became available.  Ford, however, had a policy of providing medical records within 15 days, and Ferrari does not allege that Ford exceeded this period.

Ferrari's evidence does not create a genuine dispute of material fact about whether Dr. Brewer relied on Dr. Friedman's binding medical examination, nor does it create a genuine dispute about whether Dr. Brewer honestly believed that Ferrari was using opioids or that opioid use could affect his performance.  And without regard to Dr. Brewer's medical evaluation, Ferrari's claim would fail for another reason:  he has not presented any evidence that the RMI apprenticeship decision-makers did not honestly believe that his restrictions reflected a reasonable medical judgment.  Ferrari has thus failed to present sufficient evidence of pretext to survive summary judgment.

**B.  FMLA Retaliation**

A plaintiff can prove an FMLA retaliation claim using direct or circumstantial evidence. *Daugherty*, 544 F.3d at 707.  Ferrari does not present any direct evidence of FMLA retaliation. To establish a *prima facie* case of FMLA retaliation under the indirect method, a plaintiff must show that (1) he or she engaged in an activity protected by the FMLA; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). Once a plaintiff has established a *prima facie* case of FMLA retaliation, the analysis follows the familiar *McDonnell Douglas* burden-shifting framework.  *Id.*

The district court concluded that Ferrari could not establish a *prima facie* case of FMLA retaliation because Ferrari had not presented any evidence that (a) Dr. Brewer or the FMI apprenticeship decision-makers knew about his FMLA leave, or (b) a causal connection existed between the FMLA leave and the apprenticeship decision.  In his opening brief, Ferrari points to several instances in which Dr. Brewer's notes mention that he had been on psychiatric medical leave.  Although these notes do not evidence knowledge of his FMLA activity, he argues that "[a] jury could infer that Dr. Brewer's knowledge of [his] 'medical leave' extended to his FMLA leaves, which were documented in his personnel records."  (Appellant's Br. at 55.)

This is not a reasonable inference based on the evidence in the record.  Ferrari has not presented any evidence that Dr. Brewer had access to his personnel file, let alone reviewed it. His speculation as to this point is insufficient at summary judgment.  *See Pearce v. Faurecia Exhaust Sys., Inc.*, 529 F. App'x 454, 458 (6th Cir. 2013) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and, are not enough to defeat a well-supported motion for summary judgment.").  Additionally, as Ford points out, Ferrari's psychiatric leave did not actually count as FMLA leave, though he did use two days of FMLA leave under previous certifications.  Accordingly, Ferrari needed to show that Dr. Brewer knew about these previous certifications.  He has not done so.

To establish a *prima facie* case of FMLA retaliation, Ferrari needed to present evidence of a causal connection between his FMLA leave and the adverse employment action.  He does not even argue this point in his opening brief, and his reply brief abandons the FMLA claim entirely.  Ferrari's FMLA retaliation claim therefore fails for this reason as well.

## III.  CONCLUSION

Ferrari's evidence does not create a genuine dispute of fact as to the disability discrimination claim or the FMLA retaliation claim.  For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.