NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0670n.06

Case No. 16-2748

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 01, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CLAYTON PIERCE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| GENERAL MOTORS LLC, GENE LAUER, | ) | MICHIGAN |
| GREG PEPIN, DAVID NEIL, TODD | ) | |
| AICHER, and TRENT MILLER, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE: GILMAN, SUTTON, and STRANCH, Circuit Judges.

SUTTON, Circuit Judge. Clayton Pierce claims that General Motors suspended him because of his religion (Seventh-Day Adventist) and disability (degenerative joint disease) and in retaliation for his assertion of rights (a race discrimination claim with the Equal Employment Opportunity Commission). General Motors says that it suspended Pierce because he threatened his supervisor. The district court granted summary judgment in favor of the defendants. We affirm.

Pierce worked as a "walk picker" for General Motors in its Willow Run warehouse in Michigan. The warehouse stores parts for General Motors vehicles. Walk pickers fill orders from dealers and other customers by walking through the warehouse to retrieve requested parts. Eight-hour shifts are the norm. But management sometimes requires overtime when the

warehouse is busy. The collective bargaining agreement allows management, if need be, to impose up to six mandatory Saturdays of work each year.

In December 2013, the Willow Run facility announced its first mandatory Saturday of the year. That posed a problem for Pierce because Seventh Day Adventists generally do not work on Saturdays. Pierce told David Neil, a supervisor at Willow Run, about his beliefs. Company policy, as Neil understood it, required employees to ask their direct supervisor for medical or religious accommodations. He told Pierce to talk to his direct supervisor, Trent Miller, about taking the day off. Pierce claims that, in the course of this conversation, Neil told him, "I don't care what day you go to church on." R. 27-1 at 30. Neil was not Pierce's supervisor and was not in his chain of command.

Pierce never spoke to Miller about missing the Saturday shift. He took the day off anyway. This took Miller by surprise. Miller had supervised Pierce for just a few months and did not know about his faith. Miller started disciplinary proceedings against Pierce in accordance with the collective bargaining agreement. Under that process, management places employees who violate company rules "on notice" that they might be subject to discipline. But before management can issue any discipline, it must provide its employees with a chance to present their case in a "76A" meeting with management and the union.

Consistent with this process, Miller put Pierce "on notice" that he might be subject to discipline for missing his shift. Only then did Pierce tell Miller about his faith.

Miller and Pierce dispute the rest of their conversation. According to Miller, he offered to take Pierce off "notice" as soon as he provided proof of his religious belief, such as a letter from a pastor. At least one other picker missed the mandatory Saturday for medical reasons, and Miller took that employee off notice as soon as he provided support from his doctor. Miller says

2

he offered Pierce the same opportunity. According to Pierce, Miller never made any such offer to him.

Two days later, Miller approached Pierce about the 76A meeting. According to Miller, Pierce said that he "couldn't believe" that management might potentially discipline him. R. 27-2 at 107. Pierce balled up his fists, "huff[ed] and puff[ed]," and said that he couldn't promise "who's going to come out" of the room if they held the meeting. *Id.* at 107–09. According to Pierce, he did become upset during the conversation. And he agrees that he balled up his fists and experienced symptoms of a "rage attack[]." R. 27-1 at 35–36. But he denies actually threatening Miller.

Miller reported the incident to Greg Pepin (his supervisor) and Neil, who in turn reported the exchange to Roger Pelton, the union representative. The three of them decided that there was a potential for violence and the best way to avoid it was to suspend Pierce and postpone the 76A meeting. Pelton walked Pierce out of the building after telling him about the suspension. Pierce says that Pepin screamed "get out of my building" and "I'm sick of you" as he left. *Id.* at 38.

A few weeks later, General Motors sent a letter to Pierce asking him to return to work for a 76A meeting. Pierce did not respond and has been out on medical leave ever since.

Pierce complained to the Equal Employment Opportunity Commission. Before the Commission, Pierce claimed that the company failed to accommodate his religious needs when it tried to discipline him for failing to work on Saturday. He also claimed that he was suspended because of his race and religion and in retaliation for a previous race discrimination complaint that he had filed with the Commission in October of that year. He made no mention of disability discrimination in his initial complaint and raised it only in his request for reconsideration. The Commission declined to act on Pierce's complaint and issued him a right to sue letter.

Pierce sued General Motors and several of its supervisors, raising several discrimination claims under federal and state law. The district court granted summary judgment to the company and the supervisors on all of them. Pierce does not challenge most of those rulings. He appeals only the district court's resolution of these claims: (1) religious discrimination under Title VII and Michigan's Elliot-Larsen Civil Rights Act; (2) retaliation under Title VII and Michigan's Elliot-Larsen Civil Rights Act; and (3) disability discrimination under the Americans with Disabilities Act.

We give fresh review to the district court's summary judgment ruling in favor of General Motors, and read all reasonable inferences in the record in favor of Pierce. *Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 509 (6th Cir. 2008). The familiar *McDonnell Douglas* burden-shifting framework guides our resolution of each claim. *Tepper v. Potter*, 505 F.3d 508, 515–17 (6th Cir. 2007) (Title VII religious discrimination); *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 263–64 (6th Cir. 2005) (Elliot-Larsen Civil Rights Act religious discrimination); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–32 (6th Cir. 2014) (Title VII retaliation); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311 (6th Cir. 1989) (Elliot-Larsen Civil Rights Act retaliation); *Talley v. Family Dollar Stores of Ohio*, 542 F.3d 1099, 1105 (6th Cir. 2008) (Americans with Disabilities Act discrimination).

Under this framework, Pierce bears the burden of establishing a threshold case of discrimination or retaliation. If successful, the burden shifts to the company to articulate a legitimate explanation for its decision. If the company meets this requirement, Pierce must show that the stated ground is a pretextual cover for discrimination or retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

4

There is no need to determine whether Pierce established presumptive cases of discrimination or retaliation because he cannot discredit the company's reason for suspending him. *See Cline*, 521 F.3d at 509. General Motors says that it suspended Pierce because he threatened his supervisor. Pierce has not shown that this explanation was a pretext for discrimination or retaliation, whether because it (1) lacked a basis in fact, (2) did not actually motivate the company's decision, or (3) did not suffice to motivate that decision. *Id.* at 509. His employment record counters the first two possibilities, as it records the threat and shows that he was suspended for that reason: "[m]aking a threat to a member of management." R. 27-1 at 39. Company rules counter the third possibility, as they confirm that threatening a supervisor provides grounds for a suspension.

Pierce offers a rejoinder to one of these conclusions. He denies that the company's explanation has any basis in fact. As proof, he points out that the parties dispute whether Pierce threatened Miller at all, and this factual dispute, he insists, requires a trial.

The problem is, Pepin and Neil, not Miller, made the suspension decision. They chose to suspend Pierce after listening to Miller's version of the events and after believing him. Under the "honest belief" rule, an explanation honestly believed by a supervisor counts as a factual basis for a decision, not as a pretext for that decision. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895–96 (6th Cir. 2016). Allegations that *Miller* lied about the threats do not show that *Pepin and Neil's* explanation was false or pretextual. The allegations merely show that the beliefs of Miller's supervisors could have been mistaken. *Id.* But to prove that Pepin and Neil's explanation was false or pretextual, Pierce must show that they did not honestly believe Miller's version of the events. *Id.*

The uncontroverted evidence shows that Miller reported the threat to Pepin and Neil and that they believed him. Neil answered "Yes" when asked in his deposition whether he accepted Miller's version of the events. R. 27-4 at 54. So did Pepin. R. 27-3 at 76. And Miller's reaction gave them good reason to believe his story. Both Pepin and Neil testified in their depositions that Miller looked "shook up." R. 27-3 at 76; R. 27-4 at 51. Neil added that he was "almost in tears." R. 27-4 at 51. Pierce was "a pretty big guy," they noted, and had "made intimidating body motions toward other employees and management" in the past. *Id.* at 52–53. Neil, Pepin, and union representative Pelton thus "believed that there was the potential for violence." *Id.* at 52.

Pierce offers no reason to think otherwise. He alleges that Pepin and Todd Aicher (another supervisor at the warehouse) "pad[ded]" his personnel file to make it easier to discipline him. Appellant's Br. 26. But Pierce admits that everything Pepin and Aicher put in his file was true: He *did* arrive late to two meetings in October, and he *did* receive a written reprimand as a consequence. The company at any rate did not rely on his personnel file to discipline him. Pierce also points to Neil's comment: "I don't care what day you go to church on." But that does not suggest that Neil disbelieved Miller's contention that Pierce threatened him. Pierce adds that a jury could find that Pepin and Neil acted with discriminatory or retaliatory intent under the "totality of the circumstances." *Id.* at 26. But we fail to see which "circumstance" would permit this inference, making even a "totality" of such circumstances unhelpful.

The "honest-belief rule," it is true, sometimes gives way to the "cat's paw" theory of liability, the idea that a plaintiff may show pretext when a biased lower-level supervisor without decision-making power manipulates a neutral decision maker to make an employment decision. *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017). But Pierce does not allege that

Pepin and Neil acted as Miller's dupes. He does not even suggest that Miller harbored any discriminatory or retaliatory intent. To the contrary, he acknowledges that he and Miller got along well.

Pierce's claims, for what it is worth, face other challenges. Pepin and Neil testified that they never knew that Pierce had filed a complaint with the Equal Employment Opportunity Commission and thus could not have retaliated against him for filing it. And the record indicates that Pierce failed to exhaust his disability discrimination claim with the Commission. But we need not resolve these *other* grounds for rejecting his claims. For present purposes, it suffices to say that General Motors had a legitimate nondiscriminatory explanation for suspending him, and Pierce has not shown that this explanation was a smokescreen for a discriminatory or retaliatory motive.

For these reasons, we affirm.