NOT RECOMMENDED FOR PUBLICATION
File Name:  18a0351n.06

**No. 17-1778**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 16, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| STACEY SHREVE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF ROMULUS, a Municipal Corporation, dba | ) | COURT FOR THE EASTERN |
| City of Romulus Police Department; ROBERT J. | ) | DISTRICT OF MICHIGAN |
| DICKERSON, in his official and individual capacity, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

BEFORE:    GILMAN, ROGERS, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Stacey Shreve appeals the district court's grant of summary judgment in favor of the City of Romulus in his procedural due process and disability discrimination suit.  For the following reasons, we **AFFIRM** the judgment of the district court.

## I.BACKGROUND

In July 2012, Shreve was offered, and he accepted, a police officer position with the City of Romulus Police Department.  He graduated from the police academy in December, was sworn in as a police officer, and began his Field Officer Training Program (FTO), a sixteen-week on-the-job training program for new officers.  Just two weeks into his training, Shreve was severely injured on duty; he was a passenger in a vehicle driven by his FTO officer when it was struck by another vehicle.  As a result of his injuries, Shreve was hospitalized for two weeks and was on leave from work for approximately sixteen months.

In April 2014, Shreve was cleared for work without restrictions. Upon his return, he struggled with his training and ended up restarting the program. Shreve experienced pain and discomfort as he trained and, following an examination, was given work restrictions that included no bending, kneeling, lifting, or squatting. Around the same time, Shreve asked a superior officer about being put on "light-duty" assignment, but was told that there was no light-duty work available for him. Shreve went back on medical leave in October 2014.

In February 2015, Shreve met with former Romulus Chief of Police Robert Dickerson, who was then working at the mayor's office, and with a police captain; the three discussed the possibility of transferring Shreve to a dispatcher position. Although there was no dispatcher vacancy at that time, one was expected to open up in a few months. The parties dispute Shreve's exact response, but at a minimum, he stated that he still wanted to be a police officer and that his main goal was "to try and get better to stay as a police officer." Shreve never applied for, or otherwise expressed interest in, the dispatcher job, and he was not notified when a position became available later that year.

In October 2015, while still on leave, Shreve was terminated. He was informed that the decision was made because he had been on leave for the majority of his time at the police department, and for longer than was permitted under the Collective Bargaining Agreement (CBA) governing his employment; he was unable to perform the essential functions of a police officer; and his prognosis suggested that he would not be able to return to work without restrictions in the near future. At the time of his termination, Shreve had not completed the FTO training program.

Shreve filed a complaint with the Equal Employment Opportunity Commission (EEOC) and was issued a right-to-sue letter in March 2016. He then filed suit against the City of Romulus and former Romulus Chief of Police Robert Dickerson, alleging statutory and constitutional

violations arising out of his termination. Shreve later conceded that he could not maintain any of his claims against Dickerson or his claims against the City for racial discrimination and intentional infliction of emotional distress, and the district court dismissed those claims. Shreve's procedural due process and state and federal disability discrimination claims remained. Finding that there were no genuine disputes of material fact, the court granted the City's motion for summary judgment and dismissed the remaining claims. This appeal followed.

## II. ANALYSIS

Shreve raises two arguments on appeal: first, that he had a constitutionally protected property interest in his continued employment when he was terminated; and second, that the City failed to fulfill its obligation to reasonably accommodate Shreve's disability and to engage in the interactive process in good faith as required by state and federal disability discrimination laws. **(Appellant Br. at 7–9, 10–13)**

### A.      Standard of Review

This court reviews a grant of summary judgment de novo. *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006). Summary judgment is warranted if, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### B.      Due Process Claim

Shreve brings a procedural due process claim pursuant to 42 U.S.C. § 1983, arguing that he was terminated from his police officer position without adequate notice or opportunity to respond. To maintain this claim, he must first show that he had "a protectable property interest in his position." *Kuhn v. Washtenaw County*, 709 F.3d 612, 620 (6th Cir. 2013); *see also Bailey v.*

*Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997) ("Government employment amounts to a protected property interest when the employee is 'entitled' to continued employment." (citation omitted)). If the plaintiff can demonstrate such an interest, he must then show that he was not provided constitutionally adequate process—in other words, that he was not "afforded the procedures to which government employees with a property interest in their jobs are ordinarily entitled." *Kuhn*, 709 F.3d at 620 (quoting *Miller v. Admin. Office of Courts*, 448 F.3d 887, 895 (6th Cir. 2006)).

The issues raised in this appeal relate to the first requirement. "The existence of a property interest depends largely on state law. . . . [T]o establish a protected interest in [one's] position . . . , [a plaintiff] must be able to point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment." *Bailey*, 106 F.3d at 141. "A showing that a public employee may be fired only for cause is sufficient . . . ." *Barachkov v. 41B Dist. Court*, 311 F. App'x 863, 871 (6th Cir. 2009) (citing *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004)).

Under Michigan law, "employment contracts without distinguishing features or provisions" are generally "terminable at the will of either party." *Mannix v. County of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003) (citation and internal quotation marks omitted). The Michigan Supreme Court has recognized an exception to this default rule, holding in *Toussaint v. Blue Cross & Blue Shield of Michigan* that a just-cause provision "may become part of [an employment] contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." 292 N.W.2d 880, 885 (Mich. 1980). Following *Toussaint*, Michigan courts recognize both express "just-cause" employment contracts and a "legitimate-expectations theory" of just-cause employment. *Mannix*, 348 F.3d at 532; *see also Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 597–98 (Mich. 1993).

To succeed under a legitimate-expectations theory, the plaintiff must demonstrate that the employer had policies or procedures that gave employees a legitimate expectation of just-cause, rather than at-will, employment. *Toussaint* explained that the legitimate-expectations theory is not based on traditional contract principles; rather, it is premised on the public policy principle that, "[h]aving announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." 292 N.W.2d at 895. The Michigan Supreme Court has also specified that "only policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Rood*, 507 N.W.2d at 607. If "the employer's policies relating to employee discharge are capable of two reasonable interpretations, the issue is for the jury." *Id.*

An express at-will employment relationship generally is not transformed "into a just-cause relationship by no more than a legitimate expectation on the part of the employee." *Mannix*, 348 F.3d at 533. But Michigan cases also recognize that documents such as manuals provided by the employer or oral representations can create a triable issue of fact. *See Longley v. Blue Cross & Blue Shield of Mich.*, 356 N.W.2d 20, 22 (Mich. Ct. App. 1984); *Schipani v. Ford Motor Co.*, 302 N.W.2d 307, 309–11 (Mich. Ct. App. 1981) (holding that even though there was a written contract that "specifically provided that the employment was terminable at will[,] . . . it is for the trier of fact to determine whether the contract was not terminable at will because of the defendant employer's oral or written assurances"), *disapproved of on other grounds by Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243 (Mich. 1991).

In interpreting employment contracts, Michigan law provides that, "[w]hen the language at issue is clear and unambiguous, its meaning is a question of law." *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016). "However, if the language is 'unclear or susceptible to

multiple meanings, interpretation becomes a question of fact.' . . . '[I]f reasonable minds could disagree about the conclusions to be drawn from the facts, a question for the factfinder exists.'" *Id.* (quoting *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996), and *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999)). Michigan law also instructs that "[t]he language of a contract must be construed according to its plain and ordinary meaning, rather than technical or constrained constructions." *Id.* (citing *Dillon v. DeNooyer Chevrolet Geo*, 550 N.W.2d 846, 848 (Mich. Ct. App. 1996)). "Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided." *Id.* (quoting *McCoig Materials, LLC v. Galui Constr., Inc.*, 818 N.W.2d 410, 416 (Mich. Ct. App. 2012)).

Both parties agree that Shreve's employment was subject to the CBA between the City of Romulus and the Police Officers Association of Michigan. The CBA expressly provided that probationary employees "may be terminated at the sole discretion of the Department with or without cause."[1] Therefore, if Shreve remained a probationary employee at the time of his termination, his employment was expressly at-will under the CBA, and his allegedly legitimate expectations, without further evidence, likely do not transform it into a just-cause relationship. *See Mannix*, 348 F.3d at 533. With the exception of the above-quoted provision for probationary employees, the CBA imposes a just-cause requirement for discharge. If there is a genuine dispute of fact as to whether Shreve was a probationary employee, then he also raises a factual dispute whether he had a protected property interest in his position. The critical issue—whether Shreve was a probationary employee at the time of his termination—turns in large part on the interpretation of two provisions of the CBA.

---

[1] There were two CBAs during the course of Shreve's employment. The provisions at issue are identical in each.

The relevant sections of the CBA provide:

> 8.1: An employee, who is a certified officer at time of hire, is on probation for the first twelve (12) months of employment. An employee who is not a certified officer at the time of hire is on probation for the first fifteen (15) months of employment.

> 8.2: During the employee's probationary period, that employee may be terminated at the sole discretion of the Department with or without cause. This termination will not be subject to the grievance procedure. Probationary Patrol Officers shall participate in the FTO program and must successfully complete all the elements of the sixteen (16) week program before being confirmed. After completion of the FTO program, probationary officers will be evaluated every month for the balance of the probationary period and upon successful completion of the full twelve (12), or fifteen (15), month period shall be credited with all seniority.

There is no dispute that Shreve was not certified when he was hired, and was therefore subject to the fifteen-month, rather than the twelve-month, probationary period.

Shreve argues that the CBA can be interpreted to provide that the probationary period ends after fifteen months have passed, whether or not the employee has been present or has successfully completed the FTO program. He reasons that no provision in the CBA expressly provides for tolling or extending the probationary period; that the word "confirmed" is ambiguous; and that he received seniority and pay increases during his employment—all of which create a genuine dispute of material fact as to whether Shreve was a probationary employee when he was terminated. The City responds that the CBA unambiguously requires that probationary employees successfully complete both the fifteen-month period and the FTO program to become non-probationary police officers. And because it is undisputed that Shreve had not completed the FTO program when he was terminated, the City contends, he was still a probationary employee under the plain language of the CBA, and was therefore an at-will employee with no entitlement to continued employment.

The City has the better argument. First, Shreve's interpretation would render the word "confirmed" surplusage and fail to give it effect, which is to be avoided. *See Solo*, 819 F.3d at 794. Furthermore, to interpret the CBA to permit the probationary period to expire on a specific

date, without regard to whether the probationary officer was present during that time or had successfully completed the FTO program, would both strain the meaning of "confirmed" and defeat the purpose of a probationary period. The active requirements placed on employees— successfully completing the FTO program, monthly evaluations thereafter, and successfully completing the probationary period—further support the City's interpretation of the CBA. In sum, the CBA at issue can be reasonably interpreted only one way: Shreve was a probationary employee—and therefore an at-will employee—at the time of his termination.

Both parties agree that Shreve's employment was subject to the CBA, but they disagree whether the CBA was the exclusive document governing his employment. Shreve argues that other employer policies also governed his employment, and that these policies created a legitimate expectation of a just-cause relationship. To show the existence of other relevant policies, Shreve points to his own testimony that he received policies and procedures when he started working for the police department, and he submits excerpts from a 2011 manual and minutes from a 2016 city council meeting. Viewing this evidence in the light most favorable to Shreve, we can reasonably infer that an employment manual existed throughout Shreve's employment and that Shreve received a copy of it.

However, a review of the 2011 manual excerpts contained in the record does not reveal "clear and specific employer policy statements[] regarding employee discharge," and the excerpts therefore do not create a legitimate expectation of just-cause employment. *Rood*, 507 N.W.2d at 607. The 2016 minutes show that the City Council added a provision to the City of Romulus Employees Policies and Procedures Manual, indicating that such a manual existed at that time. Without evidence of the Manual's contents, however, Shreve fails to demonstrate a dispute of fact as to whether he had a legitimate expectation of just-cause employment. Shreve also argues that

the City concealed the Manual in bad faith and requests that we draw an adverse inference against the City. The City responds that Shreve waived this argument by stipulating to the City's compliance with Shreve's discovery demands.

A brief review of the discovery process is warranted. In January 2017, Shreve filed a motion to compel the "complete policy and procedures manuals for the City of Romulus and its Police Department," including policies relating to employee discharge. The City declined to produce the Manual and argued that it responded appropriately to the request to produce because the CBA governed the terms and conditions of Shreve's employment and the Manual had "absolutely nothing to do with [his] employment status and/or his termination." The parties then "stipulate[d] and agree[d] that Defendant has now complied with Plaintiff's Discovery Requests and the Motion to Compel [ECF No. 20] is now Moot." The court entered an Order to that effect the same day. That Order resolves the discovery issues raised by Shreve.

With an express at-will employment relationship and without support for a legitimate expectation of just-cause employment, Shreve is unable to demonstrate a protectable property interest in his continued employment. Accordingly, Shreve's due process claim fails.

### C.    Disability Discrimination Claim

Shreve also argues that his federal and state disability discrimination claims under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Michigan's Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1201–14, should have survived summary judgment because there exists a genuine dispute of material fact as to whether the City failed to reasonably accommodate his disability. The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the

plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (citation omitted). The following analysis therefore applies both to the ADA and PWDCRA claims.

Under the ADA, "an employer may not discriminatorily terminate an otherwise qualified individual on the basis of his disability. One form of discrimination occurs when an employer fails to make 'reasonable accommodations' to an employee's known disability, unless those accommodations would cause 'undue hardship' to the employer." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a disability discrimination claim, "a plaintiff must show that he or she (1) is disabled, (2) [is] otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

> If there is direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then bears the burden of establishing that he or she is disabled and otherwise qualified for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged essential job requirement eliminated; or c) with a proposed reasonable accommodation.

*Id.* (citation and internal quotation marks omitted).

The ADA imposes on employers a duty to reasonably accommodate employees with disabilities unless the employer can demonstrate that doing so would create an undue hardship. *Jakubowski*, 627 F.3d at 201. Transferring an employee to a different position can be a reasonable accommodation, and "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the company for which that employee is otherwise qualified." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (brackets omitted) (quoting *Burns v. Coca-Cola Enters.*, 222 F.3d 247, 257 (6th Cir. 2000)).

The ADA also imposes upon employers a duty to engage in an interactive process with the employee. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). The purpose of the process is to "determine the appropriate reasonable accommodation for a given employee." *Kleiber*, 485 F.3d at 871 (brackets and citation omitted). It should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Rorrer*, 743 F.3d at 1040 (quoting *Kleiber*, 485 F.3d at 871). Both parties are required to participate in this process in good faith. *Kleiber*, 485 F.3d at 871. If the employer "readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff," it has generally fulfilled its obligation. *Jakubowski*, 627 F.3d at 203. While not usually required, an employer's proposal of a counter accommodation may be "evidence of good faith." *Id.*

There is no dispute that Shreve was disabled under the ADA or that he suffered an adverse employment action (being terminated) due to his disability. The key issue is whether he was "otherwise qualified for the position despite his . . . disability . . . with a proposed reasonable accommodation." *Ferrari*, 826 F.3d at 891 (citation and internal quotation marks omitted). There are two possible reasonable accommodations at issue in this appeal: light-duty assignment and reassignment to a dispatcher position.

Shreve had the initial burden of proposing a reasonable accommodation. *See Jakubowski*, 627 F.3d at 202; *Kleiber*, 485 F.3d at 870. The record indicates that Shreve inquired about light-duty assignment, which could reasonably be interpreted as proposing an accommodation. In response to Shreve's inquiry, his superior officer spoke with the human resources department and conveyed to Shreve that there was no light-duty work available "due to [Shreve's] restrictions," and the fact that he "would not be returning within the appropriate time for light-duty work."

According to former Police Chief Dickerson, a light-duty officer must have completed the field training program. Dickerson testified that the relevant standards required that all active police officers pass the FTO program and that light-duty work consisted of tasks that only trained police officers could do. Shreve never completed his FTO training program for reasons unrelated to his disability. As a result, Shreve was not "otherwise qualified" for light-duty work, and the City had no obligation to put him on light-duty assignment. *See Kleiber*, 485 F.3d at 869.

Shreve also argues that the City's failure to offer him a dispatcher position when one became available raises a factual dispute as to whether the City participated in the interactive process in good faith. The record reveals that the City met with Shreve, discussed his disability, identified and discussed possible accommodations, considered but reasonably rejected Shreve's light-duty proposal, considered transferring Shreve to another position within the department (dispatcher), discussed this option with Shreve, and offered it to him, albeit informally and before there was an actual vacancy. Though the exact nature of the dispatcher conversation is in dispute,[2] it is not material. Viewing the evidence in the light most favorable to Shreve, the record shows that at the time of the conversation, Shreve was interested in continuing to work toward becoming a police officer, conveyed that preference to the City, and never applied for, inquired about, or expressed interest in the dispatcher position. In light of these circumstances, the City's failure to offer Shreve a dispatcher position when one became available does not demonstrate bad faith.

In sum, because Shreve was not otherwise qualified for the light-duty position—the only reasonable accommodation that he proposed to his employer—and because the City participated

---

[2] Shreve testified that, in response to the offer, he "stated [he] still wanted to be a police officer" and that his "main goal" was to "try and get better to stay as a police officer." Dickerson testified that, in addition to stating that his goal was to get better and to remain a police officer, Shreve was not interested in the position and that he did not think it was a good fit for him. According to Dickerson, Shreve clearly turned it down.

in good faith in the interactive process, Shreve is unable to prevail on his disability discrimination

claims.

### III.CONCLUSION

For the reasons explained above, we **AFFIRM** the judgment of the district court.